Wright *v.* Wagner (et al., Appellant).

Argued October 5, 1961. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN and ALPERN, JJ.

argument refused·January 2, 1962.

*David Berger,* City Solicitor, with him *Edward J. Bradley,* Assistant City Solicitor, *Joseph V. Furlong, Jr.* and *James L. Stern,* Deputy City Solicitors, and *Levy Anderson,* First Deputy City Solicitor, for appellants.

*James Francis Lawler,* with him *Ostroff, Lawler & Baker,* for appellees.

OPINION BY MR. JUSTICE COHEN, December 5, 1961:

This appeal is by the City of Philadelphia from a final decree of the lower court decreeing that the contract between the City of Philadelphia (City) and the Landfill Corporation of Pennsylvania (Corporation) is a nullity, enjoining the City from using the facilities of Corporation, and further restraining the City from entering into similar contracts unless obtained by competitive bidding.

The chancellor based his conclusions chiefly on his determination that the agreement violated Sections 8-200(1) and 5-500(c) of the Philadelphia Home Rule Charter.[1]

---

[1] Section 8-200(1). "Except in the purchase of unique articles or articles which for any other reason cannot be obtained in the open market, competitive bids shall be secured before any purchase, by contract or otherwise, is made or before any contract is awarded for construction, alterations, repairs or maintenance or for rendering any services to the City other than professional services and

Briefly the facts are:

With approval of both the managing director and the law department of the City, and after city council amended the budget of the streets department by transferring funds (the rental fixed by agreement) to the Department of Public Property, the City negotiated and entered into an agreement with Corporation for a dump site in Norwood Borough, Delaware County, Pennsylvania. This agreement gave the City the privilege of dumping 500,000 cubic yards of refuse collected by City employees in the West Philadelphia area and taken to the dump site in City trucks by City employees who also perform the dumping operation. The agreement requires Corporation to operate a sanitary landfill upon said premises and to provide all required labor and equipment. No supervisory powers over Corporation's operation were retained by City. The major problem thus presented is whether this operation of landfill constitutes "rendering any services to the City" so that Section 8-200(1) of the charter requires City to secure those services only from the lowest responsible bidder.

The lower court held that since Section 5-500(c) of the city charter requires the streets department to "remove and dispose of . . . refuse" or, when "specifically authorized by Council," to contract for such disposition, the streets department had the duty not only to

---

the purchase shall be made from or the contract shall be awarded to the lowest responsible bidder."

Section 5-500(c). "Sanitation. The Department shall itself, or when specifically authorized by the Council, by contract, clean and sand City streets, remove and dispose of ashes, garbage and refuse, remove and dispose of ice and snow from City streets, design, construct, repair, maintain and operate incinerators or other plants or equipment for the disposition of ashes, garbage and refuse, and administer and enforce statutes, ordinances and regulations for maintaining the cleanliness of City streets."

dump the refuse, but to perform the additional landfill function of doing away with it. Thus, the doing away with the refuse after it was dumped by the streets department was a service which City was required to perform, and the services should have been secured by bidding as required by Section 8-200(1) of the charter.

We do not believe that it was the intention of the framers of the city charter when they used the word "dispose" in Section 5-500(c) to require the streets department to completely *do away with* the ashes, garbage and refuse. It is more reasonable to conclude that the streets department's obligation, as imposed by the city charter, was to remove and *get rid of* the ashes, garbage and refuse. That is exactly what the City of Philadelphia did when it dumped the refuse on the land of the Corporation—it got rid of the debris. From then on it became the obligation of the Corporation to operate its own facility with its own employees and under its own supervision, and to do so in such a manner as not to infringe upon or violate any of the health laws of the Commonwealth of Pennsylvania.

Obviously, the purpose of paragraph four[2] of the agreement, providing for a sanitary landfill, was not to require the performance of the landfill function as part of the consideration of the license to dump the debris; otherwise additional standards or requirements of performance would have been provided. The purpose of paragraph four was to protect City so that its right to dump would in no way be curtailed or interrupted because of Corporation's failure to abide by sanitary regulations and requirements of the Commonwealth, and hence cause City to lose the dumping site.

---

[2] "4. Licensor shall operate a sanitary landfill in and upon the said premises, and to that end shall provide all required labor, equipment, watchmen, fire protection facilities, snow fences and all other necessary service and facilities." . .

The decision of the framers of the charter not to require competitive bidding by City in obtaining sites for the dumping of debris is sound. It would be most impracticable to require competitive bidding, since all the factors, such as location of the site, layout of the site, available access to roads, traffic considerations, neighborhood sentiment and the type of debris, contribute to the uniqueness of the requirements and defy bid specifications.

The second issue concerns whether city council, under Section 5-500(c) of the charter must authorize a contract such as the one involved here and, if so, whether such authorization was actually granted here by council's amendment of the 1961 operating budget to add the $125,000 necessary for the execution of this contract. The lower court specifically ruled that council must authorize such a contract but did not give its reasons for refusing to hold that the amendment to the 1961 operating budget constituted such authorization.

Without holding that councilmanic authorization is required for the execution of this dumping contract, we feel that the above procedures engaged in by city council, acting upon the suggestions contained in the memorandum[3] supplied by the streets commissioner to the

---

[3] "Buckley & Company, Inc., contractors, located at 1317 S. Juniper Street, Philadelphia, have submitted a contract proposal for the disposal of 500,000 cubic yards of city refuse at 25 cents a cubic yard on a 50 acre property located in the Borough of Norwood, Pennsylvania. This site is conveniently located to the Southwest Philadelphia collection area where fill sites have been virtually eliminated as a result of the Eastwick Redevelopment Project.

. . .

"At the present time, due to inadequate incinerator capacity, it is necessary to operate our incinerators in the Southeast, Southwest, and Northwest portions of the city six days per week. The Buckley proposal will enable us to reduce, if not eliminate, all of the Saturday overtime work at these incinerators at a savings which will approximately equal the $125,000 cost of this proposed

members of city council, satisfied the requirement of Section 5-500(c) and constituted councilmanic authorization for the execution of the dumping contract by City.

The lower court also erred in ruling that the commissioner of the streets department abused his discretion in negotiating the contract with Corporation. The court felt that there was adequate testimony to the effect that the costs involved were exorbitant in comparison to those at other landfill sites, and that the transaction reeked of personal and political favoritism.

Unfortunately, the chancellor in this case, both by his conduct in the course of the trial and by his adjudication, demonstrated obvious and extreme bias. The chancellor became so personally involved in this litigation that his examination and cross-examination of witnesses extended to over 2,000 questions, considerably more than the number of questions asked by counsel for the plaintiff-taxpayers. The admonition which Justice (now Chief Justice) BELL quoted in *Commonwealth v. Horn,* 395 Pa. 585, 591, 150 A. 2d 872 (1959), " 'It is always the right and sometimes the duty of a trial judge to interrogate witnesses, although, of course, questioning from the bench should not show bias or feeling nor be unduly protracted' ", is most applicable here. Thus, in addition to the two reversible errors discussed above, the extensive examination of witnesses, the unduly pro-

---

contract. Elimination of the sixth day of operation in the City incinerators will result in reduced wear and tear and the eventual increased life of these facilities.

"It is therefore proposed that the 1961 Budget be amended to provide $125,000 for site rental in the Department of Public Property Operating Budget and to decrease the Streets Department personnel overtime cost figure by the equivalent $125,000. Approval of this change will not only help to solve the acute refuse disposal space problem, but will also improve incinerator plant life, all at no additional cost to the City."

552

tracted questioning from the bench and the apparent display of bias and partisanship by the chancellor vitiates the reliability of his findings and requires us to reverse his decree.

Decree reversed. Each party to pay its own costs.

---

DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:

The majority opinion reverses the decree of the lower Court which had declared the contract between the City and Landfill Corporation a nullity and restricted the City from entering into similar contracts unless obtained by competitive bidding.

The majority decision in my judgment flies in the teeth of the City Charter and certainly vitiates its spirit, purposes and objectives. The Charter provides in Section 8-200(1), that "Except in the purchase of unique articles or articles which for any other reason cannot be obtained in the open market, *competitive bids shall be secured** before any purchase, by contract or otherwise is made or *before any contract is awarded* for construction, alterations, repairs or maintenance or *for rendering any services to the City* other than professional services and the purchase shall be made from or the contract shall be awarded to the lowest responsible bidder."

The majority hold that this contract is not a contract for services but is a mere license to the City which simply permits the City to make a limited use of Landfill Corporation's land, to wit, dumping refuse for which the City pays $125,000 a year. The contract by its very terms demonstrates how utterly erroneous that interpretation is, and unless it is changed the Charter can easily be evaded, eroded and nullified by subterfuge. The contract pertinently provides: "4. Licensor

---

* Italics throughout, ours.

[Landfill Corporation] shall *operate* a sanitary landfill in and upon the said premises, *and to that end shall provide all required labor,* equipment, watchmen, fire protection facilities, snow fences and *all other necessary service* and facilities." City employees drive refuse to this dump site and deposit the refuse on the site; *Landfill then conducts a sanitary landfill operation on said premises.* The Deputy Street Commissioner of the City in a comprehensive written report on refuse disposal problems classifies sanitary landfills by private contractors as "services rendered to the city." His report pertinently states "It also represented the first time in many years that the City spent an appreciable sum of money for privately-operated *refuse disposal service.*" This view was shared by the City witness who testified that in his opinion the contract here in question was one for services to the City.

This is not as the City contends merely a release of a site for dumping refuse; Landfill does far more than merely rent its land as a dump site. The majority opinion admits, as it must, that "The agreement requires Corporation to *operate* a sanitary landfill upon said premises and to provide all required labor and equipment. No supervisory powers over Corporation's *operation* were retained by City. . . .

". . . the City of Philadelphia . . . dumped the refuse on the land of the Corporation—it got rid of the debris. From then on it became the obligation of the Corporation to *operate* its own facility with its own employees and under its own supervision. . . ." Since it is to "operate" a landfill, it is obviously rendering a service as both the language of the contract and the acts of Landfill clearly demonstrate.

The majority opinion also relies upon the uniqueness of a site for a dump refuse. The alleged uniqueness of such a site cannot possibly fall within the charter provision which specifically excepts the purchase of

a unique article from the requirement of a competitive bid. By no stretch of the imagination can the workings and sanitary processing of a landfill operation be considered the purchase of a unique article.

The deplorable evils which are certain to flow from the majority's construction of the City Charter are already evident in the instant case. We agree with the lower Court (a) that there was adequate testimony to show that the costs involved in this privately and uncompetitively negotiated landfill operation were exorbitant in comparison with the costs paid to operators of other landfill operations, and (b) "that the transaction reeked of personal and political favoritism," and (c) that the City (acting through the Commissioner of Streets) abused its discretion in making this contract with Landfill Corporation.

We quote with approval the following language from the opinion of the Court en banc: "It [the City] is here attempting to justify a privately negotiated contract, being well aware that should its efforts succeed, the result would be the creation of a rent in the civic and fiscal fabric of the Charter which, once opened, could be widened by subsequent administrative edict or councilmanic enactment. If its viewpoint is to receive judicial sanction, henceforth, all work done for the City, and specifically defined or interpreted by the City's executive or legislative officers not to be 'for construction, alterations, repairs or maintenance or for rendering any services to the City' could be awarded through the medium of a privately negotiated contract. To pose the question is to supply its answer. We shall and will not, by sustaining the City's viewpoint, open the door that inevitably leads to the evils which this section of the Charter was specifically enacted to prevent and prohibit."

I would affirm the decree on the opinion of Judge BLANC which, speaking for the Court en banc, con-

vincingly answers all of the majority's conclusions and likewise refutes in detail all of the City's contentions.

Mr. Justice BENJAMIN R. JONES joins in this dissenting opinion.