Mayer, Appellant, *v.* Hemphill.

2

Argued March 22, 1963. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Edward R. Becker* and *Stanley M. Greenberg,* with them *William A. Meehan,* for appellant.

*Edward G. Bauer, Jr.,* City Solicitor, and *David Berger,* Special Counsel, with them *Ellis A. Horwitz* and *Matthew W. Bullock, Jr.,* Assistant City Solicitors, and *James L. Stern,* Deputy City Solicitor, for appellees.

*Jerome J. Shestack,* with him *Ira P. Tiger, William A. Schnader,* and *Schnader, Harrison, Segal & Lewis,* for appellee.

OPINION BY MR. CHIEF JUSTICE BELL, April 26, 1963 :
Plaintiff, a taxpayer and registered elector, filed a taxpayer's Complaint in Equity against the Controller and other (named) fiscal officers of Philadelphia to restrain them from paying the salary of James H. J. Tate; and to enjoin Tate from holding the office of City Councilman; and such other relief as the Court may deem proper. Tate was granted permission by the Court to appear as defendant-intervenor. Tate, according to a prior decision of this Court in *Mayer v. D'Ortona,* 408 Pa. 518, 184 A. 2d 582, is an elected Councilman of the City of Philadelphia and the Acting Mayor.

Although Tate is a Councilman who is on leave of absence and performs no duties as such, and although he is only "Acting" Mayor of Philadelphia, he receives the salary of a Mayor, and exercises all the duties and powers of a Mayor.

Defendants filed preliminary objections to the Complaint and requested the Complaint be dismissed for six reasons: (1) a taxpayer's suit does not lie to test the right to hold public office; (2) quo warranto is the sole and exclusive remedy in such a case; (3) the present action is premature since Acting Mayor Tate was not a candidate for Mayor under the provisions of Section 10-107(5) of the Charter; (4) Section 3-400, and not Section 10-107(5), of the Charter is applicable to an *acting* Mayor; (5) there was a want of equity in plaintiff's Complaint in that the granting of the relief prayed for would result in unnecessary disruption of municipal affairs; and (6) the Complaint failed to state a cause of action upon which relief may be granted.

After hearing argument, the Court below sustained defendants' preliminary objections on the grounds: (1) the suit was premature since Tate had not in fact become a candidate under Section 10-107(5) of the Charter, (2) there is no jurisdiction in equity since quo warranto is the sole and exclusive remedy, and (3) as a matter of substantive law, Tate is not required to resign as Councilman or as acting Mayor in order to seek election to a full term as Mayor.

Appellant appealed from the Order of the Court below which sustained defendants' preliminary objections and dismissed the Complaint.

Philadelphia's Home Rule Charter, adopted in 1951, provides in "Section 10-107. *Political Activities.**

. . .

---

* Itàlics throughout, ours.

"(5) *No officer or employee* of the City, *except elected officers running for re-election,* shall be a *candidate* for nomination or election to any public office unless he shall have first resigned from his then office or employment.

"(6) Any officer or employee of the City who violates any of the foregoing provisions of this section shall, in addition to any penalties provided for hereafter, be ineligible for one year for any office or position under the City."

Section 10-109 of the Charter provides: "Section 10-109. Penalties. *A violation* of any of the foregoing sections of this article shall be a misdemeanor, punishable by a fine of not more than three hundred dollars or *by imprisonment* for not more than ninety days, or both, *and* if the violator is an officer or employee of the City, *by removal* from office or immediate dismissal."

The facts and circumstances which have caused this suit and this appeal are very unusual. Because they involve an interpretation of the meaning of several provisions of the City Charter,* and because of the recent decision of this Court in *Mayer v. D'Ortona,* 408 Pa., supra, and because the present factual situation is novel, differences and confusion have arisen between and among the various parties involved.

### Quo Warranto—Taxpayer's Bill

The first question on which the parties vigorously differ is whether, under these unusual circumstances, quo warranto is the sole and exclusive remedy, or

---

* Philadelphia's Home Rule Charter is a magnificent magnum opus. Because it is a detailed charter of 177 pages and because it was drawn by busy men, and because not even Solomon could foresee and clearly and specifically cover and provide for every future event or contingency, cases will undoubtedly arise involving uncertainty, doubt or confusion.

whether a taxpayer's bill and possibly other remedies such as injunctive relief, will lie.

The general rule is well settled that quo warranto is the sole and exclusive remedy to try title or right to office, whether the right which is challenged is that of a de jure or a de facto officer. It is likewise part of the general rule that quo warranto can be brought only by an Attorney General, or by a District Attorney, or by a person who has a special right or interest as distinguished from the right or interest of the public generally, or has been specially damaged. *Brinton v. Kerr,* 320 Pa. 62, 63-64, 181 A. 569; *Commonwealth ex rel. Schermer v. Franek,* 311 Pa. 341, 166 A. 878; *Commonwealth ex rel. District Attorney v. Gibson,* 316 Pa. 429, 175 A. 389; *Williams's Appeal,* 312 Pa. 477, 167 A. 587; *Commonwealth ex rel. v. Conroy,* 267 Pa. 518, 110 A. 166; *Eddy v. Ashley Borough,* 281 Pa. 4, 125 A. 308; *Dorris v. Lloyd (No. 2),* 375 Pa. 481, 100 A. 2d 599; *Commonwealth ex rel. McLaughlin v. Cluley,* 56 Pa. 270; *Commonwealth ex rel. Butterfield v. McCarter,* 98 Pa. 607; *Commonwealth ex rel. Gast v. Pfromm,* 255 Pa. 485, 100 A. 276. Cf. also *Dorris v. Lloyd (No. 1),* 375 Pa. 474, 100 A. 2d 924. And this is particularly true where such a judgment would not place the plaintiff himself in office: *Commonwealth ex rel. Schermer v. Franek,* 311 Pa., supra; *Commonwealth ex rel. v. Crow,* 218 Pa. 234, 67 A. 355.

However, there is likewise a well settled general rule that a taxpayer has a right and a standing to sue to enjoin public officials from wrongfully or unlawfully expending public money, and in such cases the complainant need not have any special interest which is damaged other than his interest as a taxpayer: *Smith v. Gallagher,* 408 Pa. 551, 185 A. 2d 135; *Butcher v. Philadelphia,* 382 Pa. 34, 114 A. 2d 120; *Scudder v. Smith,* 331 Pa. 165, 200 A. 601; *Page v. King,* 285 Pa. 153, 131 A. 707; *Harris v. Philadelphia,* 299 Pa. 473, 149 A. 722.

Sometimes these two general rules collide or overlap. Moreover, appellant points out that in recent years *exceptions* have been wisely recognized by the Courts to the narrow circumscribed limited remedy of quo warranto for several reasons: (1) quo warranto does not always furnish an adequate and full remedy; (2) the wisdom of applying a remedy which will avoid a multiplicity of suits; (3) the paramount right of the public to have a surer and more adequate remedy to restrain wrongful acts by a public official, including the unlawful expenditure of public money. Where such circumstances exist, equitable relief has been granted through a taxpayer's bill or other injunctive or equitable remedy. Cf. *Smith v. Gallagher,* 408 Pa. 551, 185 A. 2d 135; *Schrader v. Heath,* 408 Pa. 79, 83, 182 A. 2d 696; *Wright v. Wagner,* 405 Pa. 546, 175 A. 2d 875; *Pennsylvania State Chamber of Commerce v. Torquato,* 386 Pa. 306, 125 A. 2d 755; and cases cited pages 328-329; *Butcher v. Philadelphia,* 382 Pa., supra; *Gladwyne Colony, Inc. v. Lower Merion Township,* 409 Pa. 441, 447, 187 A. 2d 549; *Baker v. Carr,* 369 U.S. 186; *Bowers v. Reitz,* 315 Pa. 310, 172 A. 707; *Kerr v. Trego,* 47 Pa. 292; *Appeal of Town Council,* 22 W.N.C. 431, 15 A. 730.

Appellant contends that three very important questions are necessarily involved in this case and they cannot be adequately answered nor can the public be fully and promptly protected by quo warranto. These questions are (1) the title or right to office of Tate, (2) the right of a fiscal officer to lawfully pay any salary to Tate, and (3) which if any provisions of the City Charter with their severe criminal and civil penalties apply to Tate. For example, appellant contends that payment of public funds to Tate is illegal and must be enjoined because Tate is *no longer* (a) a City Councilman or (b) President of City Council or (c) acting Mayor or (d) Mayor. Appellant contends that

this is clear as to (a), (b) and (c) under the resignation and removal provisions of the Charter; as to the office of Mayor it is clear under *Mayer v. D'Ortona* 408 Pa., supra. Although the present action was brought against the fiscal officers of the City and not against Tate, the various important and highly controversial legal questions seriously affect not only Tate and the payment of his salary, but also and even more importantly the lawful and orderly administration of the City of Philadelphia.

Appellant further contends that a taxpayer's bill is both appropriate and necessary for *realistic* reasons, viz., since quo warranto can be brought only by a District Attorney or by an Attorney General, (or by a person who is specially interested or specially damaged), the suit may never be brought and the public may never be protected for one or more reasons, i.e., (1) misapprehension of the law by the official; (2) volume and pressure of the official's other public business; (3) an unwise exercise of discretion by the official; or (4) politics. Courts are striving to get away from technicalities in order to promote justice and if the public interest is to be protected, Courts cannot blind themselves to realities. However, because of the well known exigencies in the circumstances here present, we shall, without deciding the procedural question, assume that a taxpayer's bill will lie.

### Meaning of Pertinent Charter Provisions

An interpretation of pertinent provisions of the Charter, which is desired by all the parties, raises complex and difficult questions. Is Tate an *officer* of the City, and if so is he a *candidate* for nomination for Mayor, and if so must he first resign? To answer these questions will obviously require a careful consideration of the pertinent provisions of the Philadelphia City Charter and their application to the facts of this case.

Tate (who was not an original defendant but was allowed by the Court to become a defendant-intervenor) places an entirely different meaning and interpretation upon ·Section 10-107(5)· than do either the appellant or the original defendants. Tate's first contention is that·he does not fall within the ·prohibitions of·Section 10-107(5),* because he is *acting* Mayor of Philadelphia, and although he is *only acting* Mayor·*he is governed by Section 3-400* of the City Charter, which by its terms applies *only to a Mayor.* His second contention is that *he is a Councilman* and Section 10-107-(5) has no application *whatsoever* to a Councilman, and does not prevent a Councilman from running for another office without resigning.

Section 3-400 provides: "The *Mayor* shall serve for a term of four years beginning on the first Monday of January following his election. He shall not be. eligible for election for more than two successive terms; and he shall not during his term. of office be a candidate for any other elective office whatsoever. Should he announce his candidacy for any other office he shall be automatically disqualified to continue to serve as Mayor, and the office.shall be deemed ·vacant."

Tate's first argument is very strange in view of· the fact that he contends that *he is still a Councilman and is not Mayor* of Philadelphia, but only an "acting". Mayor—even though he exercises all the powers and duties of and receives the salary of Mayor. There is no provision in the City Charter for an "acting" Mayor, and certainly such an entity is not specifically covered or governed by Section 3-400. It is difficult, therefore, to appreciate how counsel for Tate can so often blow hot and cold—to have him Mayor when it suits their purpose, and only a Councilman and President of City

---

* Tate also contends on the record in this case he is not a "candidate" within the meaning of Section 10-107(5); this contention will be discussed infra.

Council (on leave of absence) when that suits their purpose. Having contended that he does not have to resign in order to be a candidate for Mayor *because he is an acting Mayor and not a Councilman,* Tate* further confuses the issue by his second contention, namely, that *he is a City Councilman* and Section 10-107(5) —which prohibits all officers and employees of the City, except elected officers running for re-election, from being a candidate for any public office unless he first resigns—has no application whatsoever to a Councilman.

### A City Councilman is an Officer of the City within Section 10-107(5)

The reason that Section 10-107(5) has (allegedly) no application to a Councilman is because a Councilman is not an elected *officer* or employee of the City within the meaning of that Section and consequently a Councilman can be a candidate for *any other* public office without first resigning. Although a Councilman is paid out of the City treasury, he is, according to Tate, the only person on the City payroll who (a) can engage in *certain* political activities which are prohibited to all officers and employees of the City, and (b) does not have to resign when he is a candidate for another office. This is wholly contrary to the spirit of the Charter and cannot possibly be accepted. Neither the letter of the Charter nor the spirit permits such an interpretation!

Tate deduces this interpretation from the fact that there are a number of provisions in the City Charter which provide separately and specifically with the Mayor, and others which provide separately with Councilmen, and others which provide for "officers and employees." He contends that a repetition of certain re-

---

* Through his various counsel.

quirements or powers or duties of Councilmen would therefore be unnecessary if Councilmen were "officers" within the meaning of the Charter. The fallacy of this contention is apparent from the fact that many provisions of the Charter deal specifically and solely with the Mayor, and yet even Tate agrees that the Mayor is a City officer. While certain powers are specifically granted to, and duties are specifically imposed upon the Mayor and City Councilmen, respectively, an examination of the Charter will demonstrate that these provisions are inserted for the purpose of clarity and certainty, and not to erect *in matters of public policy such as this,* a Berlin Wall between a Councilman on the one hand, and a Mayor and all other City officers on the other hand. In an attempt to demonstrate the soundness of this contention, Tate quotes, inter alia, Section 4-400(a), which provides that the Law Department "shall furnish legal advice to the *Mayor,* to the Council, and to *all officers,* departments, boards and Commissions." Instead of supporting Tate's position this has exactly the opposite effect. If there were any logic or merit to Tate's argument on this point, it would have been entirely unnecessary for the Charter to mention the Mayor in this Section, because, we repeat, the Mayor is an *officer* of the City within the meaning of many provisions of the Charter, as even Tate admits.

Even more importantly, Tate, in his attempt to draw this sharp line of demarcation between a Councilman and a Mayor or other officer or employee of the City, has completely overlooked the other pertinent provisions of Article X, Sections 10-107 and 10-101 et seq., of the Charter. In addition to Section 10-107(5) of Article X, upon which Tate bases (erroneously) his principal if not his entire argument on this point, Article X, Section 10-107(3) and Sections 10-100, 101 and 105, refute this contention. For example, "Section 10 107. Political Activities" provides: "(3) *No*

*officer or employee of the City* and no officer or employee of any governmental agency whose compensation is paid from the City Treasury shall, from any person, . . . directly or indirectly demand, solicit, collect or receive, or be in any manner concerned in demanding, soliciting, collecting or receiving, any assessment, subscription or contribution, whether voluntary or involuntary, intended for any political purpose whatever . . . ." Can it be reasonably contended that a Councilman can solicit or collect contributions for political purposes?

Other provisions of Article X confirm the construction that Councilmen are included as officers within the meaning of Section 10-107(5). Article X reads: "Prohibited Activities of Councilmen, City Officers, Employees and Others, and Penalties."

"Section 10-100. Councilmen Not to Engage in Certain Activities; Penalties." Section 10-100 then prohibits Councilmen from engaging in certain activities, including being interested directly or indirectly in any contract for the purchase of property, or the erection of a structure, or supplying any services to be paid for out of the City Treasury, or recommending the appointment of any person to any position in the Civil Service.

"ANNOTATION

. . .

"Purposes: 1. Ethical standards of conduct preclude one who is *a City officer* from soliciting in a private capacity or personally profiting or being interested, directly or indirectly, in contracts with the City whose officer he is. See Act of June 24, 1939, P. L. 872, Section 682."

Section 10-101 provides: *"Officers and Employees Not to be Brokers or Agents for Procuring Bonds.* No officer or employee whose compensation is paid out of the City Treasury shall directly or indirectly be the broker or agent who procures or receives any compen-

sation in connection with the procurement of bonds for City officers or employees.

"ANNOTATION

. . .

"Purposes: 1. *Any officer or employee* who is paid from the City Treasury (*e.g.* City and County officers and employees *and Councilmen*) may not, directly or indirectly, be a broker or agent profiting from the bonding of City officers or employees. See Annotation to Section 10-100. Past experience indicates the desirability of this prohibition.

"Section 10-105. Gratuities. *No officer or employee of the City* and no officer or employee whose salary or other compensation is paid out of the City Treasury shall solicit or accept any compensation or gratuity in the form of money or otherwise for any act or omission in the course of his public work. . . ."

The Annotation to this Section states: "Purposes: 1. . . . The solicitation or acceptance of any such benefit by any City officer or employee of the executive or *legislative branch* or by any County or other governmental employee whose compensation is paid from the City Treasury is prohibited.

"2. For penalties for violating this section, see Section 10-109."

No one would dare to contend that the City Charter intended to allow a Councilman (a) to be a broker or agent for City business or (b) to be interested in or benefited from City contracts or (c) to receive compensation or gratuities for any act or omission in the course of his public duties, or (d) to solicit or receive contributions from civil service employees or from other persons for a political purpose—yet that would logically and necessarily be the result of Tate's contention that a Councilman is not an officer or employee of the City under Section 10-107(5).

A consideration of all the aforesaid provisions of the Charter and of the Charter *in its entirety* makes it clear that this contention of Tate, viz., *allowing a Councilman but no other "elected officer or employee of the City"* to be a candidate for election to a different (public) office without first resigning is contrary to both the letter and the spirit of the Charter.*

## Is Tate a Candidate?

We note that the word "candidate" is not defined in the Philadelphia Home Rule Charter. Candidate is not a word of art. "Candidate" must, therefore, be construed in the light of its common, ordinary and generally accepted meaning. *Fidler v. Zoning Board of Adjustment,* 408 Pa. 260, 264, 182 A. 2d 692; *Commonwealth Tr. Co. Mtg. Invest. Fund Case,* 357 Pa. 349, 54 A. 2d 649. Cf. also, *Commonwealth ex rel. Laughlin v. Green,* 351 Pa. 170, 40 A. 2d 492; *Leonard v. Commonwealth,* 112 Pa. 607, 4 A. 220; Statutory Construction Act of May 28, 1937, P. L. 1019, §33, 46 P.S. §533.

In view of the penalties provided for in Section 10-107(6) and in Section 10-109, we agree with appellees that Section 10-107(5) must be strictly construed. The original defendants who are appellees herein disagree with Tate's aforesaid contentions. These appellees contend that when strictly construed, this Section does not apply to Tate for two reasons: First, and most important, Tate does not become *a candidate for nomination* or election to the office of Mayor *until after (a) he files nomination papers for the Mayoralty and (b) the time for withdrawal of nomination to that office*

---

* *Freund v. Cox,* 321 Pa. 548, 183 A. 924, which is relied upon by appellee, is clearly distinguishable. In that case the Court correctly held that Councilmen were not included in and under the *Civil Service* provisions of that Charter. Any analysis of those provisions will disclose that they were very different from the challenged provisions of the present Charter.

*has expired.* This construction is absolutely devoid of merit. Secondly, these appellees contend that to hold otherwise would bring confusion and chaos to the City. This is also without merit.

Appellant, on the other hand, contends that Tate became a candidate for Mayor *when he announced his availability and his willingness to be a candidate* for nomination for the office of Mayor. This contention is entirely unrealistic and equally devoid of merit. Appellant averred, "8. On December 17th, 1962, JAMES H. J. TATE announced that he was *seeking* the office of Mayor of Philadelphia in the Municipal Election of 1963 and he offered himself for said office. By said declarations, he thereby, became a candidate for the office of Mayor and is at the present time a candidate for the office of Mayor."

The appellant concedes that he did not aver that on December 17, 1962, Tate announced that he was a candidate, but in effect merely announced that he was willing and glad to become a candidate. There were undoubtedly several thousand persons in Philadelphia who were available, willing and anxious to be a candidate* for Mayor on the Democratic ticket.

Although several of the above mentioned cases interpret the word "candidate" in the broad sense in which it is used by appellant, namely, "one who seeks or aspires to some office, or offers himself for the same", this is certainly too broad a definition of the language used in Section 10-107(5). We are convinced that the language of Section 10-107(5) : "shall be a ‎candidate for nomination or election", when construed strictly and in the light of its common ordinary usage, *means filing nomination papers or publicly announcing*

---

* Can there be any doubt that Richardson Dilworth, and John F. Kennedy, and Richard M. Nixon, and Nelson A. Rockefeller, were active *candidates* for a different and higher office for many years before publicly announcing their candidacy?

*one's candidacy for such office.* This construction is further supported by Section 3-400 of the Charter pertaining to the disqualification of a Mayor *if he announces* his candidacy for any other office. The record in this case does not disclose any such action, nor any such announcement by Tate.

We therefore hold that Tate at the commencement of this suit and in the light of the record in this case was not a candidate for nomination or election to the office of Mayor of Philadelphia, and the taxpayer's action was premature.

However, the facts and the exigencies of this unusual situation require a decision on the merits. After Mayer's complaint was filed but before the appeal was orally argued in this Court, Tate filed nomination papers and publicly announced his candidacy for nomination to the office of Mayor of Philadelphia. If we merely dismissed the present complaint in Equity on the ground that it was premature, another taxpayer's suit or even a quo warranto proceeding would almost certainly be immediately brought to test Tate's candidacy and his status. It is therefore in the public interest that this case be disposed of and the very important questions involved *be decided on their merits,* in order to avoid the uncertainty and confusion and inevitable harm which would otherwise result. We shall therefore take judicial notice of the fact that James H. J. Tate is now a candidate for the office of Mayor of Philadelphia.

It is clear that under the decision in *Mayer v. D'Ortona,* 408 Pa., supra, and in the light of the Charter provisions and the principles hereinabove enunciated, Tate would have to resign as Councilman in order to be a candidate for Mayor.

Most of the vexing controversial issues in this case and the resulting confusion have been caused by the Court's decision in *Mayer v. D'Ortona,* 408 Pa., supra.

This confusion can be eliminated and an orderly workable administration of City Government can be preserved by overruling that decision. In that case a majority of the Court decided* that Tate was not Mayor of Philadelphia; he was a Councilman and was President of City Council, as well as *acting* Mayor of Philadelphia; and there was no vacancy in the Councilmanic District from which Tate had been elected Councilman (a) even though the residents of that Councilmanic District were thereby left without actual representation in Council, and (b) even though Tate performed none of the duties of a Councilman, and (c) even though there was no such office as *acting* Mayor when an elected Mayor died or resigned. That conclusion was arrived at by virtue of the language in Section 3-500 of the Charter.

"Section 3-500. Mayor. An election to fill a vacancy *for an unexpired term in the office of Mayor* shall be held at the next municipal or general election occurring more than thirty days after the vacancy occurs, unless the vacancy occurs in the last year of the term, in which event a *Mayor* [not an acting mayor] shall be *chosen* by the Council by a majority vote of all its members. Until the vacancy is filled, or in case of the Mayor's temporary disability, the President of the Council shall act as Mayor; and if the President of the Council shall resign or be unable to act, then the Chairman of the Finance Committee of the Council shall act as Mayor."

That section, in the light of possible and existing circumstances, is undoubtedly ambiguous.

The dissenting opinion held that a consideration of that section of the Charter, *together with other pertinent sections of the Charter and a realistic and common sense interpretation thereof,* demonstrated that

---

* The writer of the present opinion filed in that case a vigorous dissenting opinion.

18

Tate was Mayor of Philadelphia, that there was a vacancy in the Councilmanic District from which he had been elected, and the electors of that District were entitled to a real and not an imaginary or make-believe representative in City Council. It further said that under the Charter and the governmental organization of Philadelphia, the offices of Mayor and of City Councilman were absolutely incompatible and, except during temporary disability, the two positions, Mayor and Councilman, could not be filled by one person.

The effect of the Court's decision in *D'Ortona* was that if a Mayor of Philadelphia resigned or died one month after his induction, the President of City Council should thereafter be *"acting"* Mayor until the next municipal election,* viz., for as long as possibly two years, but that if a mayor died less than one year—11 months and 29 days, or one month—before the expiration of his term, *"a Mayor [not an 'acting' mayor] shall be chosen by the [city] Council by a majority vote of all its members"*. A construction which produces a result which is unreasonable and wholly unworkable should not be adopted if a construction which will produce a sensible result can reasonably be adopted: Statutory Construction Act of May 28, 1937, P. L. 1019, Art. IV, §52, 46 P.S. §552; *Gagliardi v. Ambridge Borough*, 401 Pa. 141, 145, 163 A. 2d 418; *Seburn v. Luzerne & Carbon County Motor Transit Company*, 394 Pa. 577, 580, 148 A. 2d 534.

A situation has arisen which was not presented at the time of that decision. In the light of the existing situation and its resulting confusion, it is clear that the *D'Ortona* decision is not consonant with the long recognized interpretation of the analogous provisions of the Constitution of Pennsylvania, Article IV, §§13 and 14, and of Article II, §1, paragraph 6, of the Con-

---

* *Cali v. Philadelphia*, 406 Pa. 290, 177 A. 2d 824.

stitution of the United States. For example, Sections 13 and 14 of the Pennsylvania Constitution provide as follows: "Section 13. In case of the death, conviction on impeachment, failure to qualify, resignation, or other disability* of the Governor, the powers, duties and emoluments of the office, for the remainder of the term, or until the disability be removed, shall devolve upon the Lieutenant Governor.

"Filling Vacancy in Lieutenant Governor's Office;
Election of Successor to President Pro Tempore
"Section 14. In case of a vacancy in the office of Lieutenant Governor, or when the Lieutenant Governor shall be . . . unable to exercise the duties of his office, the powers, duties and emoluments thereof for the remainder of the term, or until the disability be removed shall devolve upon the President pro tempore of the Senate; and the President pro tempore of the Senate *shall in like manner become Governor* if a vacancy or disability shall occur in the office of Governor; . . . ."

The Federal Constitution provides: "In case of the Removal of the President from Office, or of *his Death, Resignation,* or inability* to discharge the Powers and Duties of the said Office, the Same [the powers and duties] shall devolve on the Vice President, and the Congress may by Law provide for the Case of Removal, Death, Resignation, or Inability,* both of the President and Vice President, declaring what Officer shall *then act as President, and such Officer shall act* accordingly, until . . . a President shall be elected."

The language of Article II, §1, paragraph 6, of the Constitution of the United States with respect to whether a Vice President succeeds to the Presidency upon the death or resignation of a President, or wheth-

---

* Inability or disability, temporary or permanent, has caused grave concern to Congress and to experts in Constitutional law. No such uncertainty or doubt exists where a President resigns or dies.

20

er he becomes merely an *acting* President possessing, however, all the powers and duties of the Presidency, is as strong or stronger in favor of an *acting* President than the language in favor of an *acting* Mayor under Philadelphia's Home Rule Charter. Yet it is a matter of history which every American knows that Vice Presidents John Tyler, Millard Fillmore, Andrew Johnson, Chester A. Arthur, Theodore Roosevelt, Calvin Coolidge and Harry S. Truman became respectively President of the United States, and not acting President, upon the death of the then President.

To resolve the present uncertainties and confusion which have resulted from *Mayer v. D'Ortona* and were not foreseen or anticipated when that decision was written, and in accordance with the spirit and a reasonable and realistic interpretation of the provisions of the Charter in its entirety, and in order to safeguard the orderly and workable administration of the Government of Philadelphia, *Mayer v. D'Ortona* is hereby overruled,* and Tate is declared to be Mayor of Philadelphia.

---

* No one has advocated and supported as strongly as the writer of the present opinion, the principle of stare decisis which is part of the law of Pennsylvania: *Borsch Estate*, 362 Pa. 581, 589, 67 A. 2d 119. However, it is sometimes forgotten that there are well recognized exceptions to this rule. It is obvious, if we are to progress, that there always will be exceptions to every general rule or principle, and that neither the law nor the principle of stare decisis can or should be as immutable as "the laws of the Medes and the Persians."

Mr. Justice FRANKFURTER, in his concurring opinion in *Green v. United States*, 356 U.S. 165, 192 (1958) said: "To be sure, it is never too late for this Court to correct *a misconception in an occasional decision*, even on a rare occasion to change a rule of law that may have long persisted but also have long been questioned and only fluctuatingly applied."

I would further hold that the principle of Stare Decisis should always be applied, except in the two situations set forth by Justice FRANKFURTER and in the following situations: (1) Where the Su-

Since Tate is Mayor of the City of Philadelphia, under a reasonable and realistic interpretation of Section 10-107(5) of the City Charter, and of the Charter in its entirety, he can be a candidate for that office without first resigning and without incurring the penalties which the Charter would otherwise impose upon him.

Decree affirmed; each party to pay own costs.

Mr. Justice MUSMANNO joins in this Opinion and particularly agrees with the overruling of *Mayer v. D'Ortona,* and the holding that James H. J. Tate is the present Mayor of Philadelphia and as such can be a candidate to succeed himself as Mayor without the necessity of resigning. However, there are several expressions in the Court's Opinion with which Justice MUSMANNO does not agree.

----

CONCURRING OPINION BY MR. JUSTICE COHEN:

Since there are no provisions in the Philadelphia Home Rule Charter dealing specifically with the office of "acting mayor," the Charter's command that the President of City Council assume the office of mayor upon the death, resignation, or temporary disability of the mayor has raised problems concerning the privi-

----

preme Court of Pennsylvania is convinced that prior decisions of the Court are irreconcilable, or (2) *the application of a rule or principle or decision has undoubtedly created great confusion*; or (3) in those rare cases where the Supreme Court of Pennsylvania is convinced that the reason for the law undoubtedly no longer exists, and modern circumstances and Justice combine to require or justify a change, and no one's present personal rights or vested property interests will be injured by the change. These exceptions are set forth at length in the dissenting opinion in *Michael v. Hahnemann Medical College & Hospital,* 404 Pa. 424, 438, 439, 172 A. 2d 769.

leges and responsibilities of the acting mayor.[1]  The proper approach in this matter should be one of seeking the policy behind the particular Charter provision in question rather than attempting rigidly to categorize the acting mayor as mayor or councilman for all times and for all purposes.

Appellant asserts—and the majority agrees—that our decision in *Mayer v. D'Ortona* clothes the acting mayor with the status and obligations of councilman. This is a complete misunderstanding of that decision. In *Mayer v. D'Ortona,* we merely held that the President of City Council did not forfeit his councilmanic seat when he assumed the office of acting mayor. One of the considerations contributing to that result was the unfairness which would result if the President of City Council was unable to resume his seat in Council where the mayor recovered from his temporary disability, or where the vacancy in the office of mayor was filled by a special election prior to the expiration of the acting mayor's term as councilman.[2]  Certainly we did not intend to brand the acting mayor as a councilman for all provisions of the Charter and hence deprive him and the City of Philadelphia of the powers of the mayoralty office during the incapacity of the mayor.

---

[1] Section 3-500 of the Charter states that the "President of the Council shall *act* as Mayor." (Emphasis supplied.) Hence, as we observed in *Mayer v. D'Ortona,* it is clear that the Charter framers did not intend the President of City Council to *become* mayor. The Charter is so clear on this point.

[2] For example, suppose the mayor and the President of City Council, are elected in November, 1959 and the mayor dies in January, 1961. The President of City Council would thereupon serve as acting mayor and a special election for mayor would be held in November, 1961. Suppose the acting mayor did not wish to seek the office of mayor. Absent our decision in *Mayer v. D'Ortona,* he would be compelled to forfeit the last two years of his term as councilman.

Turning to the Charter provisions in question, sections 3-400 and 10-107(5) state the general proposition that one shall not be a candidate for public office without first resigning his present city position. The policy behind this prohibition is set forth in the official annotation as follows: "This requirement is imposed because an officer or employee who is a candidate for elective office is in a position to influence unduly and to intimidate employees under his supervision and because he may neglect his official duties in the interests of his candidacy."[3]

The framers of the Charter, however, made an exception to this prohibition in the situation where the office sought is the one presently held. Thus section 3-400 provides that the mayor need not resign if he is a candidate for mayor.[4] Presumably, the basis of this exception was a value judgment that the benefit from encouraging continuity in office was more important to city government than the possible harm resulting from the evils envisaged in the above-mentioned annotation. Since the policy of encouraging continuity in office applies as forcefully to an acting mayor as to an elected mayor, I would hold that the framers of the Charter did not intend that an acting mayor be forced to resign in order to run for mayor.

However, even if appellant is correct in his contention that *Mayer v. D'Ortona* compels us to regard the acting mayor as a councilman for all provisions of the Charter, I find no provision which requires a councilman to resign in order to run for public office.

Appellant cites section 10-107(5) which provides: "No officer or employee of the City, except elected of-

---

[3] Philadelphia Home Rule Charter §10-107(5), annotation 5 (1951).

[4] "[The mayor] shall not during his term of office be a candidate for any *other* elective office whatsoever." Philadelphia Home Rule Charter, §3-400 (1951). (Emphasis supplied.)

ficers running for reelection, shall be a candidate for nomination or election to any public office unless he shall have first resigned from his then office or employment." A review of the structure and purposes of the Charter makes it clear that the term "officer or employee" as used in section 10-107(5) refers to the executive branch of city government and not to councilmen or other legislative officials, as contended by appellant.

In the first place, it should be noted that section 10-107(5) is a penal statute since one violating its provisions faces penalties of ninety days imprisonment, three hundred dollars fine, and ineligibility of one year for any city position.[5] Accordingly, the statute must be narrowly construed. Statutory Construction Act of May 28, 1937, P. L. 1019, §58, 46 P.S. §558.

Secondly, an examination of the various provisions of the Charter discloses that the framers did not intend to include city councilmen within this prohibition. Throughout the Charter, a dichotomy is drawn between "officers or employees" on the one hand, and "councilmen" on the other. For example, section 3-306 states that "all officers and employees of the City shall be citizens of the United States." If "officers and employees" includes councilmen, what is the need for a separate section—section 2-103—which provides that "a councilman shall be a citizen of the United States." Section 10 itself further illustrates this dichotomy between legislative and executive officials of city government. Section 10 is entitled "Prohibited Activities of Councilmen, City Officers, Employees and Others." Section 10-100 enumerates certain prohibited activities for councilmen; section 10-102 sets forth comparable

---

[5] See Philadelphia Home Rule Charter, §§10-107(6) and 10-109 (1951).

restrictions for "city officers and employees."[6] Throughout the remainder of section 10, the term "no person" is used in contradistinction to "no officer or employee" where the intent is to include councilmen as well as executive officials.[7]

Moreover, this Court held in *Freund v. Cox,* 321 Pa. 548, 183 Atl. 924 (1936), that councilmen were not included within a provision of the 1919 Charter which referred to "officer, clerk, or employee" of the city. The framers of the 1949 Charter were well aware of this judicial interpretation of the phrase "officer or employee."[8]

Finally, if we look at the purposes of section 10-107(5), as set forth in the Official Annotation above, we can see why the framers of the Charter would make the traditional differentiation between the executive and legislative branches of government. Section 10-107(5) was passed to prevent elected officials from improperly utilizing the powers of their present office to gain another office. Members of the executive branch, who control large numbers of employees, present a more serious threat of such abuse than do councilmen who

---

[6] Other examples of this dichotomy are section 8-410 (legal advice for "any officer, department, board or commission") and section 2-105 (legal advice for councilmen) ; section 3-600 (salary of "Mayor and other officers") and section 2-100 (salary of councilmen). Also to be noted is section 5-1102 which authorizes the Department of Records "to examine the records of any office, department, board or commission." The Official Annotation states that this section does not extend to records of City Council because of due respect for the separation of administrative and legislative functions of government.

[7] See, e.g., §10-107(1) : "No person shall seek or attempt to use any political endorsement in connection with any appointment to a position in the civil service."

[8] The section of the 1919 Charter which was involved in *Freund v. Cox* is cited as a source for section 10-107. See Philadelphia Home Rule Charter, §10-107, Annotation (1951).

may control only one or two employees. Moreover, in enacting section 10-107(5) the Charter framers were fearful that an officer might neglect his official duties in pursuance of his candidacy. It is much more disruptive of city government where the single individual in charge of an executive department neglects his duties in order to campaign, than where one of the seventeen members of City Council so acts. Herein lies the rationale for the different treatment of the executive and legislative branches of city government by the Charter framers.

In conclusion, I would hold that the policy of encouraging continity in office applies as equally to an acting mayor as a mayor, and hence neither of them must resign under section 3-400 in order to run for mayor. However, even if appellant is correct in asserting that *Mayer v. D'Ortona* compels us to label the acting mayor as a councilman, section 10-107(5) does not require a councilman to resign in order to run for mayor.

For these reasons, I concur only in the result.

<hr />

CONCURRING AND DISSENTING OPINION BY MR. JUSTICE ROBERTS:

I join in the decision of the Court that this case should be decided on its merits. However, I would go further and hold that the taxpayer's complaint in equity is proper and appropriate (and that quo warranto is not the sole and exclusive remedy), rather than merely "assume that a taxpayer's bill will lie." Cf. *Smith v. Gallagher,* 408 Pa. 551, 185 A. 2d 135 (1962); *Schrader v. Heath,* 408 Pa. 79, 182 A. 2d 696 (1962); *Wright v. Wagner,* 405 Pa. 546, 175 A. 2d 875 (1961); *Butcher v. Philadelphia,* 382 Pa. 34, 114 A. 2d 120 (1955). I join also in that portion of the Court's opinion which holds that a councilman is an "officer"

within the meaning of Section 10-107(5) of the Charter.

However, I desire to note my disagreement with the view of the majority that the suit was prematurely brought and that Defendant-Intervenor Tate did not become a "candidate" until he filed his nomination petitions. When he became a "candidate" is a question of fact to be determined by the record and not by any arbitrary test which is unrelated to what long experience and observation have demonstrated. The complaint filed on January 7, 1963, alleged that "On December 17th, 1962, James H. J. Tate announced that he was seeking the office of Mayor . . . and he offered himself for said office . . . and is at the present time a candidate for the office of Mayor." This well-pleaded averment was undenied and on the record presented was an undisputed fact in the court below, as it is here.[1] It is legally sufficient and conclusive on this factual issue. The word "candidate" in the Charter must be considered to have its usual and generally accepted campaign-for-election meaning. Cf. *Commonwealth ex rel. Laughlin v. Green,* 351 Pa. 170, 176, 40 A. 2d 492, 494 (1945). Even if it be conceded that a "public announcement" is a prerequisite to becoming a candidate, such announcement can be accomplished in a variety of ways, depending upon the political strategy employed—by a speech, statement, advertisement, or other communication reported or appearing in public media, or by any other technique for achieving the desired political effect.

In the light of the foregoing, if we attribute to his actions their usual significance, the conclusion is ines-

---

[1] The filing of preliminary objections constituted an admission of all well pleaded facts in the complaint. *Bogash v. Elkins,* 405 Pa. 437, 176 A. 2d 677 (1962) ; *Erie v. Gulf Oil Corp.,* 395 Pa. 383, 150 A. 2d 351 (1959) ; *Silver v. Korr,* 392 Pa. 26, 139 A. 2d 552 (1958).

capable that Defendant-Intervenor Tate was a candidate by his choice and design long before the hour he filed his nomination petitions. His signed statement could have been no more articulate announcement of his candidacy. Prior to the date of his filing, not even the most casual observer of Philadelphia political life would have hesitated to describe him as an avowed and active candidate. For any judicial tribunal in the community (particularly one at the appellate level) to fail to recognize this obvious fact is almost incredible. A man is a candidate when "his hat is in the ring", and the record here most convincingly and unquestionably establishes that Defendant-Intervenor Tate's hat was in the ring when this proceeding was begun.

Further, I disagree with that portion of the decision of the Court which concludes that James H. J. Tate may be a candidate for Mayor without first resigning his councilmanic office and that Section 10-107(5) is not applicable to his present candidacy. To reach this result would require an interpretation which excludes an elected councilman from the explicit provisions of Section 10-107(5) of the Charter or a finding that an elected councilman (as here), when a candidate for Mayor, is not a councilman. There is nothing in the Charter or in the record or in "the well known exigencies in the circumstances here present" or "the facts and the exigencies of this unusual situation" or "the public interest"[2] which requires or even suggests such a result.

The Charter is a practical document designed to improve and advance the quality of local governmental operation. In seeking to attain that objective, the Charter limits the political activity of officers and employees "paid from the City Treasury."[3] Section 10-107(5) explicitly restricts the permitted candidacy of

---

[2] From majority opinion, pp. 8 and 16.

[3] Section 10-107(3).

an elected official to re-election to the office to which he was elected—without first resigning. No greater harm could come to the Charter than a determination which fails to recognize and apply the clear language and meaning of Section 10-107(5). Not to do so is, in reality, to rewrite the Charter and to frustrate its objective.

The record before us is clear. Appellee Tate was elected a councilman for a term which has not expired. He is not running for re-election as Mayor because he has never been elected to that office. The tenure of his office as councilman was not terminated by him and still continues. As an elected councilman, he may, during the term of his office, be a candidate for re-election *only* to the office of councilman. He is a candidate not for that office but for *another* office, and that is distinctly prohibited by Section 10-107(5) of the Charter. This conclusion is dictated by the Charter itself and is firmly supported by the record, reason and reality.

I can find no factual or legal basis or acceptable rationalization for the result reached by the majority. I would, therefore, reverse the decree so that the provisions of the Charter may be applied.

---

DISSENTING OPINION BY MR. JUSTICE BENJAMIN R. JONES:

I want to register my dissent from the action taken by the majority of this Court because I am convinced that (a) the *conclusion* reached by the majority contravenes the clear and unambiguous language, as well as the spirit, of Section 10-107(5) of the Charter of the City of Philadelphia and (b) the *manner* in which such conclusion is reached cannot help but undermine the confidence of the Bench, the Bar and the public in the *stability* of the decisions of this Court.

In dismissing this taxpayer's bill in equity, the court below did so on three grounds: (1) that this action was instituted prematurely; (2) that equity lacked jurisdiction to entertain this action, quo warranto being the sole and exclusive remedy; (3) that James H. Tate, as a candidate for election as Mayor of the City of Philadelphia, was not required by the terms of the City Charter to resign as a member of City Council. The majority of this Court, in effect, now holds, inter alia, that this action was prematurely instituted but that equity can entertain jurisdiction of this action: to that extent, the majority of this Court disagrees with the court below. Were this the sole basis for the majority ruling, in all likelihood, I would not file a dissenting opinion. While I entertain very serious doubt that equity, rather than quo warranto, is the appropriate remedy, I believe that the exigencies of the present situation and the interests of the public demand a speedy and immediate resolution of the instant controversy on its merits.

That which impels my dissent is the action of this Court, through the medium of overruling our very recent decision in *Mayer v. D'Ortona*, 408 Pa. 518, 184 A. 2d 582, in *now* holding that James H. J. Tate is not a member of the City Council and is the Mayor of the City, whereas *only six months ago* this Court declared *on the same posture of facts* that Mr. Tate was a member of the City Council and was not the Mayor, but the *Acting* Mayor, of the City. By its ruling, this Court *now* rules that Mr. Tate, as the Mayor, is not within the proscriptive provisions of Section 10-107(5) of the City Charter.

Section 10-107(5) of the Charter provides: "(5) No *officer* or employee of the City, except elected officers running for re-election,[1] shall be a candidate for

---

[1] Mr. Tate is certainly not within this exception.

*nomination* or election *to any public office unless he shall have first resigned from his then office* or employment." (Emphasis supplied) It is beyond question that Mr. Tate was duly elected as a member of the Council of the City; that during his tenure in the office of councilman, Richardson Dilworth resigned as Mayor of the City; that an action was then instituted to determine the *status* of Mr. Tate in the government of the City; that, on October 10, 1962, this Court held that Mr. Tate, although the *Acting* Mayor of the City, retained his councilmanic office; that when Mr. Tate, then a councilman and so recognized by this Court, became a candidate for nomination to the office of Mayor, he did not first resign his councilmanic office.

The basic issue is whether Mr. Tate, at the time he became a candidate for nomination to the office of Mayor, was an "officer" of the City within the intendment of Section 10-107(5), supra. In resolving this issue, the majority of this Court, excluding Mr. Justice COHEN, initially considered Mr. Tate's two distinct contentions: (1) that, as Acting Mayor of the City, he is within the provisions of Section 3-400[2] rather than Section 10-107(5), of the Charter; (2) that Section 10-107(5) does not apply to him since, as a member of Council, he is not an "officer" of the City. After a discussion of both contentions, the majority rejected them; with such rejection I am in agreement. The majority opinion then states: ". . . under the decision in Mayor v. D'Ortona, . . . and in the light of the Charter provi-

---

[2] Section 3-400 provides: "The Mayor shall serve for a term of four years beginning on the first Monday of January following his election. He shall not be eligible for election for more than two successive terms; and he shall not during his term of office be a candidate for any other elective office whatsoever. Should he announce his candidacy for any other office, he shall be automatically disqualified to continue to serve as Mayor, and the office shall be deemed vacant."

sions . . . Tate would have to resign as Councilman in order to be a candidate for Mayor." With that statement I am in full accord.

However, the majority of this Court then proceeds to overrule *Mayer v. D'Ortona,* to change the status of Mr. Tate so recently enunciated by this Court and to declare that Mr. Tate is neither a member of Council nor the *Acting* Mayor but the Mayor of the City to whom the provisions of Section 10-107(5) are inapplicable. *Only six months ago* this Court, in a well considered opinion, determined Mr. Tate's status to be that of councilman and *Acting* Mayor: *today,* on the same set of facts, this Court completely changes Mr. Tate's status and declares him to be Mayor. With such juristic acrobatics I will have no part!

One seeks in vain in the majority opinion for *any* justifiable reason to overturn *Mayer v. D'Ortona.* Under such circumstances how can this Court reasonably expect to enjoy or retain the confidence of the Bench, the Bar and the public in the *stability* of its rulings? Clearly, the end does not justify the means.

An examination of the provisions of Section 10-107(5) *clearly* and *unequivocally* reveals the intent of the framers of the Charter, i.e., to prohibit an "officer" of the City from becoming a candidate for nomination or election to another public office without first resigning his then office. In my opinion, Mr. Tate clearly is a member of Council and, as such member of the Council, is an "officer" to whom the provisions of Section 10-107(5) apply and, under the provisions of that section, Mr. Tate, before becoming a candidate for nomination for the office of Mayor, was required to resign his councilmanic office. His failure to resign such office constitutes a forfeiture of that office and disqualifies him from being a candidate for the office of Mayor.