## Chalfin, Appellant, v. Specter.

465

Argued September 25, 1967. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*Marvin Comisky,* with him *Edwin P. Rome,* and *Blank, Rudenko, Klaus and Rome,* for appellant.

*Arlen Specter,* appellee, in propria persona.

*Edward G. Bauer, Jr.,* City Solicitor, with him *John Mattioni,* Assistant City Solicitor, *Matthew W. Bullock, Jr.,* Second Deputy City Solicitor, and *Levy Anderson,* First Deputy City Solicitor, for other appellees.

OPINION PER CURIAM, October 2, 1967:
Decree affirmed. Each party to pay own costs.

———

CONCURRING OPINION BY MR. CHIEF JUSTICE BELL:
This case arose by a Complaint in Equity brought by Paul M. Chalfin, a candidate for Controller on the Democratic ticket and a taxpayer, against (1) Arlen Specter, the present District Attorney of Philadelphia and the candidate for Mayor on the Republican ticket, and (2) the City Commissioners and other City officers. The Complaint prayed for an injunction (1) enjoining the City Commissioners from placing the name of Specter on the ballot as a candidate for Mayor in the Philadelphia municipal election on November 7, 1967, and (2) to restrain defendants from making any payments pertaining in any way to the candidacy of Specter for the office of Mayor, and (3) enjoining Specter from remaining as a candidate for Mayor unless he forthwith resigns the office of District Attorney, and (4) such further general relief as may be just and proper under the circumstances. This suit was not brought before July 28, 1967 as in fairness it should have been. The Court below, on August 31, 1967, sustained defendant Arlen Specter's preliminary objection to the Complaint in Equity and dismissed plaintiff's complaint. This was a final and therefore an appealable Order.

This Court advanced the hearing and sat specially on September 25, 1967 to hear arguments and to consider this appeal because of the fact that the City Commissioners alleged that the preparation of the ballots, the printing and the preparation of all the balloting and election machinery, must be commenced by them on or before September 26, 1967. *The time element is one of the important factors which must be taken into consideration in our determination of this case.*

The present case is very unusual and of tremendous importance to the people of Philadelphia, and the difficulties and the differences are the result (1) of this Court's Opinion (a) in *Com. ex rel. Specter v. Martin,* 426 Pa. 102, 232 A. 2d 729, and (b) in *Com. ex rel. Specter v. Freed,* 424 Pa. 508, 517, 228 A. 2d 382, which pertinently was not joined in by a majority of this Court, and (2) other facts which will be hereinafter discussed.

In the *Martin* case, which was an action of mandamus, brought by Specter to compel the payment of his salary as District Attorney of Philadelphia County, Justice JONES, joined by Justices O'BRIEN and ROBERTS, held (1) that Specter was entitled to his salary, and (2) that the District Attorney of Philadelphia was a *State* officer, and (3) as such was not subject to the Philadelphia Home Rule Charter, and (4) did not have to resign as District Attorney when he became a candidate for the office of Mayor.

Justice EAGEN, in a concurring and dissenting Opinion, held that "Specter is still the de jure district attorney of Philadelphia and is entitled to the relief he sought in this action, namely, payment of the salary incident to the office." Justice EAGEN further said that although it was unnecessary to the Court's decision, "It is my personal conclusion that Specter, as District Attorney of Philadelphia, is within and sub-

ject to the provisions of the Philadelphia Home Rule Charter, particularly §10-107(5)."

Chief Justice BELL filed a dissenting Opinion in which he pertinently stated that quo warranto was the proper remedy in that case, that the case was moot because Specter had been paid and was receiving his salary, but the questions involved were of such great public importance that it was proper to consider the case on the merits. So considered, and most important, he stated that under the clear and mandatory language of the Constitution of Pennsylvania, *Specter was a City officer* and not a State officer, and was subject to the provisions of the Philadelphia Home Rule Charter. Justice MUSMANNO agreed on this point with the Chief Justice. Justice COHEN was absent, because of illness. This meant that a majority of the Judges (three Judges of this Court and the Court below) believed and held that Specter was a State officer and could be a candidate for Mayor without resigning as District Attorney, while three Judges of this Court believed that Specter was a City officer and was subject to the City Charter.

The net result of the *Specter-Martin* case and the language in the Court's Opinion in the *Freed* case, supra, and the affirmance of the Court below—plus the Opinion of the City Solicitor of Philadelphia in a kindred case in which he advised the City Commissioners that John B. Kelly, Jr.'s name must remain on the ballot as a candidate for Councilman at large in the November 1967 municipal election—was doubt, uncertainty and bewildering confusion. While this regrettable confusion was not anyone's fault, it is clear that these facts and these Court Opinions were justifiably relied upon by Specter, at least until changed by this Court, and that Specter and virtually the entire community were misled in reliance thereon.

In the present case, (a) the real and fundamental issue has been wisely, and, as we shall see, properly raised by a Complaint in Equity, and (b) we have a full Court.

The Constitution of Pennsylvania pertinently provides in *Article XIV:*

"*Section 1. County officers shall consist of* sheriffs, coroners, prothonotaries, registers of wills, recorders of deeds, commissioners, treasurers, surveyors, auditors or controllers, clerks of the courts, *district attorneys** and such others as may from time to time be established by law; . . .*"

Pursuant to the enabling Act of April 21, 1949, P. L. 665, the people of Philadelphia adopted on April 17, 1951 a Home Rule Charter, effective January 7, 1952. In the meantime, the people of Pennsylvania adopted on November 6, 1951—effective immediately upon its adoption—*an amendment to Article XIV* of the Constitution *by adding thereto Section 8,* which pertinently provides: "§8. City and county of Philadelphia; consolidation of governmental functions; county officers abolished.

"(1) In Philadelphia all county offices are hereby abolished, and the city shall henceforth perform all functions of county government within its area through officers selected in such manner as may be provided by law.

. . .

"(3) All laws applicable to the county of Philadelphia shall apply to the city of Philadelphia.

. . .

"(7) Upon adoption of this amendment *all county officers shall become officers of the City of Philadelphia,* and, until the General Assembly shall otherwise provide, shall continue to perform their duties and be

---

* Italics throughout, ours.

elected, appointed, compensated and organized in such manner as may be provided by the provisions of this Constitution and the laws of the Commonwealth in effect at the time this amendment becomes effective, . . ."

The aforesaid language of the Constitution of Pennsylvania is, we repeat, crystal clear. It states in the clearest imaginable language that *District Attorneys* are County—not State—officers, and in Philadelphia, by virtue of the above-quoted Constitutional provisions and the Home Rule Charter, are *City—not State—officers,* and no Procrustean stretch can alter or change or nullify this clear language. Moreover, it is important to further note that while his term of office and his salary are fixed by the Legislature (1) the District Attorney of Philadelphia (a) is elected, and (b) is paid—not by the Commonwealth but—by the people of Philadelphia, and (2) the District Attorney of Philadelphia is *elected in municipal* instead of in State-wide elections, and (3) the essential and principal and most important powers, functions, duties, limitations and boundaries of the District Attorney of Philadelphia involve only crimes committed—not throughout the Commonwealth but—only in the City of Philadelphia.*

Justices JONES, O'BRIEN and ROBERTS remain of the opinion that the District Attorney of Philadelphia is a State officer and is not subject to the City Charter, or compelled to resign in order to be a candidate for Mayor. However, the majority of this 7-Judge Court agree with me on this point and are convinced that under the Constitution of Pennsylvania and the Philadelphia Home Rule Charter, the District Attorney of Philadelphia is a *City* officer and is subject to the Home Rule Charter.

The Philadelphia Home Rule Charter provides, in §10-107(5): "No officer or employee of the City, ex-

---

* All of this is equally pertinent and applicable to every District Attorney in every County in Pennsylvania.

472

cept elected officers running for re-election, shall be a candidate for nomination or election to any public office. unless he shall have first resigned from his then office or employment." Subsequent provisions of the Home Rule Charter impose severe penalties against any City officer who violates any of the provisions of the Charter.* To impose these penalties upon Specter would be so unfair and unjust that the City Solicitor of Philadelphia stated at the bar of the Court in the *Specter-Martin* case that neither he nor any other party in that case would ask that these penalties be imposed upon Specter, and the present complaint takes the same position—obviously, I repeat, for the reason that they correctly thought it would be very unfair and very unjust. One of the important questions, nevertheless, is—since Specter is a City officer, can these penalties be waived? Moreover, there is the additional very important fact that, according to the uncontradicted averments of the City Commissioners, the printing of ballots and the setting up of ballot machinery must commence on September 26, 1967. Because of the difficult legal questions involved, it was not possible for this Court to resolve the questions and issues until today, namely, October 2nd. Under these very unusual facts and circumstances, are the people of Philadelphia to be denied the right to vote for a candidate for Mayor on one of the two major tickets, i.e. the Republican ticket, and if not, what is the appropriate remedy?

Specter contends that §976 and §977 of the Pennsylvania Election Code of June 3, 1937, P. L. 1333, govern, and since the appellants have not complied therewith *by challenging his nomination papers within*

---

* Sections 10-107(6) and 10-109. Section 10-107(6) provides: "Any officer or employee of the City who violates any of the foregoing provisions of this section shall, in addition to any penalties provided for hereafter, be ineligible for one year for any office or position under the City."

*seven days after the last day for filing,*\* as the Code requires, the present appeal should be quashed, or dismissed. With this contention I disagree, because the Election Code is clearly inapplicable to the basic question here involved. The Code, in §976, provides: "When any nomination petition . . . is presented in the office . . . of any county board of elections for filing within the period limited by this act, it shall be the duty of the said . . . board to examine the same. No nomination petition . . . shall be permitted to be filed *if—(a) it contains material errors or defects apparent* on the face thereof, or on the face of the appended or accompanying affidavits; or (b) *it contains material alterations* made after signing without the consent of the signers; or (c) *it does not contain a sufficient number of signatures* as required by law; Provided, however, That . . . the county board of elections, although not hereby required so to do, may question the genuineness of any signature or signatures appearing thereon, and if he or it shall thereupon find that any such signature or signatures are not genuine, such signature or signatures shall be disregarded in determining whether the nomination petition, nomination paper or nomination certificate contains a sufficient number of signatures as required by law; or (d) . . . *if nomination petitions* have been filed for printing the name of the same person *for the same office,* except the office of judge of a court of record, upon the official ballot of more than one political party; or . . . (f) *if* the nomination petitions are not accompanied by the *filing fee or certified check* required for said office; or (g) in the case of *nomination papers,* the *appellation* set forth therein is *identical with or deceptively similar to the words used by any existing party or by any political body* which has already filed nomination papers for

\* Section 977.

the same office, or *if the appellation* set forth therein *contains part of the name, or an abbreviation of the name* or part of the name of an existing political party, or of a political body which has already filed nomination papers for the same office."

Moreover, to extend this Code to facts such as are here involved would extirpate quo warranto, which the provisions of the Code never eliminated or were intended to eliminate.

Quo warranto is the traditional and long-established action to try title to office. The general rule is well settled that, with certain exceptions hereinafter set forth, quo warranto is the sole and exclusive remedy to try title or right to office, whether the right which is challenged is that of a de jure or a de facto officer. Where, because of exceptional facts and circumstances, quo warranto does not furnish an adequate and full remedy, it is the paramount right of the public to have an adequate remedy granted through Equity: *Mayer v. Hemphill,* 411 Pa. 1, 190 A. 2d 444, and cases cited therein.

In *Mayer v. Hemphill,* the Court said (pp. 6-7) : "The general rule is well settled that quo warranto is the sole and exclusive remedy to try title or right to office, whether the right which is challenged is that of a de jure or a de facto officer. It is likewise part of the general rule that quo warranto can be brought only by an Attorney General, or by a District Attorney, or by a person who has a special right or interest as distinguished from the right or interest of the public generally, or has been specially damaged. Brinton v. Kerr, 320 Pa. 62, 63-64, 181 A. 569; Commonwealth ex rel. Schermer v. Franek, 311 Pa. 341, 166 A. 878; Commonwealth ex rel. District Attorney v. Gibson, 316 Pa. 429, 175 A. 389; Williams's Appeal, 312 Pa. 477, 167 A. 587; Commonwealth ex rel. v. Conroy, 267 Pa. 518, 110 A. 166; Eddy v. Ashley Borough, 281 Pa. 4, 125 A.

308; Dorris v. Lloyd (No. 2), 375 Pa. 481, 100 A. 2d 599; Commonwealth ex rel. McLaughlin v. Cluley, 56 Pa. 270; Commonwealth ex rel. Butterfield v. McCarter, 98 Pa. 607; Commonwealth ex rel. Gast v. Pfromm, 255 Pa. 485, 100 A. 276. Cf. also Dorris v. Lloyd (No. 1), 375 Pa. 474, 100 A. 2d 924. . . .

"However, there is likewise a well settled general rule that a taxpayer has a right and a standing to sue to enjoin public officials from wrongfully or unlawfully expending public money, and in such cases the complainant need not have any special interest which is damaged other than his interest as a taxpayer: Smith v. Gallagher, 408 Pa. 551, 185 A. 2d 135; Butcher v. Philadelphia, 382 Pa. 34, 114 A. 2d 120; Scudder v. Smith, 331 Pa. 165, 200 A. 601; Page v. King, 285 Pa. 153, 131 A. 707; Harris v. Philadelphia, 299 Pa. 473, 149 A. 722.

"Sometimes these two general rules collide or overlap. Moreover, appellant points out that in recent years *exceptions* have been wisely recognized by the Courts to the narrow circumscribed limited remedy of quo warranto for several reasons: (1) quo warranto does not always furnish an adequate and full remedy; (2) the wisdom of applying a remedy which will avoid a multiplicity of suits; (3) the paramount right of the public to have *a surer and more adequate remedy* to restrain wrongful acts by a public official, including the unlawful expenditure of public money. Where such circumstances exist, equitable relief has been granted through a taxpayer's bill or other injunctive or equitable remedy. Cf. Smith v. Gallagher, 408 Pa. 551, 185 A. 2d 135; Schrader v. Heath, 408 Pa. 79, 83, 182 A. 2d 696; Wright v. Wagner, 405 Pa. 546, 175 A. 2d 875; Pennsylvania State Chamber of Commerce v. Torquato, 386 Pa. 306, 125 A. 2d 755; and cases cited pages 328-329; Butcher v. Philadelphia, 382 Pa., supra; Gladwyne Colony, Inc. v. Lower Merion

Township, 409 Pa. 441, 447, 187 A. 2d 549; Baker v. Carr, 369 U.S. 186; Bowers v. Reitz, 315 Pa. 310, 172 A. 707; Kerr v. Trego, 47 Pa. 292; Appeal of Town Council, 22 W.N.C. 431, 15 A. 730."

Because of the time element in connection with the printing of the ballots and the election machinery hereinabove mentioned, unless this Court takes a position *forthwith* on Specter's status and rights, Philadelphia voters may be restricted to only one mayoralty candidate on a major party ticket. Furthermore, *if Specter should be elected Mayor and is thereafter declared ineligible, it is clear that unless complete equitable relief is granted now,* in and by this case, (1) the majority of the voters of Philadelphia will be disfranchised, and (2) countless thousands of citizens of Philadelphia will have campaigned and have wasted their time and money in vain, and (3) the taxpayers will likewise be required to pay for large illegal expenditures. Equally important, unless this Court decides *now* the basic questions and issues which are necessarily involved and inherent in this case, the *orderly administration* of the office of Mayor and of the *Government* of the City of Philadelphia may be *jeopardized* and partially paralyzed for a considerable length of time, and the *public interest and welfare* will in all likelihood be seriously injured and *certainly cannot be fully and promptly and adequately protected.**

---

* It is certainly regrettable that Justice MUSMANNO (1) went far outside the record, and (2) failed to consider or be limited by all the *"record" facts*, especially the undenied averments of the City Commissioners as to *the time necessary* in a city of 2,000,000 people with nearly 1,000,000 registered voters to have all the ballots printed and thereafter placed in the voting machines, as well as the intricacies of the election machinery in this large general municipal election, and (3) utterly failed to consider and properly evaluate in this *Equity* action, all the equities of this case, but instead engaged in Procrustean stretches of the facts, the record, the logic, the Equities and the Law.

All of the above recited facts make this case as difficult as a Chinese puzzle. The situation is so confused and muddled, I am going to cut the Gordian knot and present the following practical and equitable solution.

Under these exceptionally unusual circumstances, I believe (1) that Equity will lie, and (2) that the District Attorney of Philadelphia is a City officer, and (3) that Specter justifiably relied upon, and like countless other citizens was (of course unintentionally) misled by the prior decisions of this Court, and (4) because of this and the other facts hereinbefore set forth, including particularly the limited time for preparation of the balloting machinery, Specter should be permitted to be a candidate for Mayor of Philadelphia without resigning his office as District Attorney. To hold otherwise, under all the very unusual facts and circumstances and exigencies hereinabove set forth, would be a gross miscarriage of Justice!

For these reasons, I concur in the affirmance of the Decree of the lower Court.

---

CONCURRING OPINION BY MR. JUSTICE ROBERTS:

No amount of verbal histrionics, legal irrelevances, or judicial smokescreens can conceal the simple issue, the resolution of which disposes of the present appeal. Section 977 of the 1937 Pennsylvania Election Code, 25 P.S. §2937, provides that all nomination petitions and papers shall be deemed valid unless objected to within seven days after the last day for filing. Arlen Specter filed his petition on March 7, 1967. As of March 14, 1967, nary an objection had been heard. Now, more than six months later, appellant stands before this Court, in equity, and seeks to enjoin Arlen Specter from running for mayor of Philadelphia unless he first resigns his office of district attorney. Thus, the issue is framed: is §977 of the Pennsylvania

478

Election Code the *sole* and *exclusive* remedy for challenging a person's right to run for political office in Pennsylvania? On July 6, 1967, this Court in *Jaspan v. Osser*, S. Ct. Pa., East. Dist., Jan. Term, 1967, No. 393, held that it is.[1] There is no reason to stray from that holding now. Accordingly, on the authority of *Jaspan*, I believe the present appeal should be quashed.

Any attempt to distinguish *Jaspan* can only serve further to pinpoint its identity with the present situation. Procedurally, the two cases are identical. In *Jaspan*, the appellant therein sought to oust John B. Kelly, Jr. as a candidate for City Council on the theory that under the residency requirements of the Philadelphia Home Rule Charter he was ineligible to run. This complaint in equity was dismissed on the ground that §977 of the Election Code is the sole remedy.[2] Jas-

---

[1] *Jaspan's complaint was dismissed by President Judge* GOLD *on the precise ground that §977 was the exclusive remedy. An appeal from this decision was quashed upon petition and answer, without argument and without opinion. The fact that this appeal was quashed "without prejudice" indicates only that additional remedies under the election code, if any, could still have been pursued. Those words "without prejudice" were never intended to permit an action in equity, as the appellant contends. Indeed, the very appeal that was quashed was an action in equity.*

[2] *Much has been made of the fact that §976 of the Pennsylvania Election Code, 25 P.S. §2936, speaks only of technical defects in nomination papers and petitions which are patent on their face. From this it has been argued that the remedy section of the code, §977, can only be invoked when such defects appear, and therefore, an underlying defect, such as the ineligibility of a candidate, is not covered by the code. Not only does Jaspan itself prove that such is not the case (Kelly's alleged defect was his residence; it was certainly not patent), but the language of 977 shows, without doubt, that it was not intended to cover only the defects enumerated in §976. Section 977 recites that "if the court shall find that said nomination petition or paper is defective under the provisions of section 976 . . . or was not filed by persons entitled to file the same, it shall be set aside." (Emphasis supplied.) The last phrase is a clear legislative "catch-all" designed precisely for attacks such as could have been made in* Jaspan *and should be*

pan's appeal was then quashed by this Court. So also does the present appellant challenge a candidate's right to run because of an alleged conflict with the Philadelphia Home Rule Charter. So also was the present appellant's complaint dismissed below. And, so also should this Court now quash the present appeal.

Nevertheless, if, by some fantastic stretch of logic and law, the merits of this equity action are *properly* reached, the result is equally clear.

It is not open to question that only *city* officers are controlled by the Charter. So, once again, the issue is obvious: is Arlen Specter a city or a state officer? And, the answer is supplied not by one, but by two cases decided by this Court within the last year. The office of district attorney is a *state* office; Arlen Specter is a *state* officer. In *Commonwealth ex rel. Specter v. Freed,* 424 Pa. 508, 228 A. 2d 382 (1967), it was held that the district attorney did not have the subpoena power mandated by the Philadelphia Home Rule Charter since he was not subject to that Charter. Finally, as late as July 3, 1967, in *Commonwealth ex rel. Specter v. Martin,* 426 Pa. 102, 232 A. 2d 729 (1967), the district attorney was successful in a mandamus action to compel payment of his salary, *again,* because he was not a city officer and was not governed by the Philadelphia Home Rule Charter. Attempts have been made to undercut the holding in *Martin* by noting that only three Justices on the six member Court actually held Specter to be a state officer, a fourth concurring on the theory that Specter was entitled to be paid because he was at least a *de facto* district attorney. Two Justices dissented. To say that the mathematics of *Martin* prove that this Court did not really hold Spec-

made here. Appellant's contention that the italicized language refers to the individuals who sign the petitions, rather than to the candidates themselves, is simply without merit.

ter to be a state officer is merely self deluding. Even had the concurring opinion been a dissent, thus leaving the Court divided 3-3, we would nevertheless have affirmed on the decision of the court below wherein Judge WATERS held Specter to be a state officer.

I fully realize that the seven day "statute of limitations" provided by §977 is a short one. Nevertheless, appellant Chalfin cannot be heard to say that it worked an injustice on him. More than a mere taxpayer, the appellant is himself a candidate for City Controller of Philadelphia; he is a lawyer knowledgeable in political affairs. When Arlen Specter filed his petition on March 7, 1967, Chalfin no doubt was fully aware of all the legal entanglements that would be spawned by this act. Yet, not only did he fail to move within the seven days allowed under the law, he waited over *four and one-half months* before coming into equity. In a court where clean hands are the uniform of the day, appellant certainly deserves his share of demerits.

For these reasons, I concur in the affirmance of the court below.

Mr. Justice JONES and Mr. Justice O'BRIEN join in this concurring opinion.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

In all my 35 years as a judge, I have never had to suffer the pain which grips me as I write this opinion. However, loyalty to the law dictates, fidelity to the people of Pennsylvania requires, and honesty to myself commands that I speak the truth. In the words of the immortal bard, "they breathe truth that breathe their words in pain."* Thus, no matter how it hurts my sensibilities, I must speak the truth.

I have deep respect for our Chief Justice, I admire his abilities and his devotion to the ideals of our coun-

---

* Richard II, Act 2, Scene 1.

try, and I cherish for him a deep sentiment of friendship. Thus, it is agonizing to me to express my mortification over the terrible mistake he has made in this case. Concomitant with my mortification over what the Chief Justice has done in this distressing litigation, there goes an expression of mystification as to how it came about. Why would a judge steeped in the splendid traditions of the law, take a position which puts him in a situation so wholly indefensible in law, in logic, and in common sense? And so diametrically opposed to everything he has officially said on the subject?

As recently as July 3, 1967, Chief Justice BELL proclaimed in a magnificently reasoned Opinion that: *"The Philadelphia Home Rule Charter Governs Specter and Requires Him to Resign."*

This expression was not merely text, it was a caption, a heading set out in the middle of the page with each word beginning with a capital letter. He followed this heading with the well-known quotation from the Home Rule Charter, §10-107(5), namely, *"No officer* or employee *of the City,* except elected officers running for re-election, shall be a candidate for nomination or election to any public office unless he shall have first resigned from his then office or employment."

Then Chief Justice BELL said, with a definiteness, a finality and an irrevocability that left no retreat from his position: "The reason for this provision in re resignation is obvious. Such an officer would be in a position to unduly influence and to intimidate employees under his supervision, and might often neglect his official duties in the interest of his candidacy."

Not only did Chief Justice BELL declare District Attorney Arlen Specter a city officer, but he chided Justices JONES, O'BRIEN and ROBERTS for taking an opposite view. He said that these Justices "have ignored

482

the language and the spirit of Philadelphia's Home Rule Charter; and far worse, *they have ignored the clear and mandatory language of the Constitution of Pennsylvania.*"

The Chief Justice, then, in that Opinion, wrote out another heading, again beginning each word with a capital letter, to emphasize that he meant what he said:* *"The Constitution Makes Specter a City Officer."*

And then, castigating the three Justices who said Specter was a state officer, Chief Justice BELL said: "no wishful thinking nor any procrustean stretch can alter or change or nullify this clear language." Procrustes, for the benefit of those who do not remember their Greek mythology, was the jolly Attica robber who was known for his hospitality. He gloried in the fact that he always accommodated his guests perfectly. He boasted of a bed that fitted every guest, no matter what might be his size. If the guest was too short to reach from the top of the bed to the foot of the bed, Procrustes would stretch the guest so that he would fill in the empty space in the bed. If the guest was too long, Procrustes simply chopped off the excess of the guest's legs. The Chief Justice said that no such stretching on the part of Brothers JONES, O'BRIEN and ROBERTS could alter the clear language of the City Charter which makes Specter a City Officer. But in the present case, the Chief Justice reverses the process and chops the bed to fit the occupant, that is, he chops the City Charter to fit Arlen Specter.

How does the Chief Justice explain. this new Procrustean view? He says that this Court misled Specter in the cases of *Specter v. Freed,* 424 Pa. 508, and *Specter v. Martin,* supra. In all the three cases which have come before us on the subject of the City Charter's

---

* Comm. ex rel. Specter v. Martin, 426 Pa. 102.

application to the District Attorney's office, Mr. Specter has revealed himself astute, shrewd and wholly aware of what is taking place. He has demonstrated that he is thoroughly capable of trimming his sails to any adverse wind which might spring up as he speeds his craft of personal ambition over the seas of political expediency.

Anyone who has been following this litigation from its early stages, and watching Specter's strategic maneuvers, would have to honestly say that it would be impossible to mislead Specter in this field. To say that Specter could be misled in this lawsuit would be like saying that a bloodhound on a fresh trail could be misled.

When the present case came before our court for argument on Monday, September 25th, I asked Mr. Specter to explain his present position, since, on November 21, 1966 he had stated he was a *city* officer and on May 2, 1967, he had stated he was a *state* officer. Mr. Specter replied that he did not say on November 21, 1966, that he was a city officer. He said he had only asked us to tell him what he was. This denial of Mr. Specter controverts my distinct recollection of what he said and it questions the recollection of others in the courtroom at the time, including the communication media. The Philadelphia *Inquirer* on September 2, 1967, recalling the argument of November 21, 1966, said: "The high court first considered the relationship of the District Attorney and the Charter late last year. This was in an appeal brought by Magistrate M. Phillip Freed, who said Specter had no right to subpoena his records. Specter—*in direct opposition to his current stand*—argued that the District was given subpoena power *under the City Charter.*" (Emphasis supplied.)

Not only that, in his Opinion of July 3, 1967, Chief Justice BELL said: "Furthermore, Specter now takes

a position . . . *diametrically opposite* to the position which he (impliedly and necessarily) took in his brief and in his oral argument in Com. ex rel. Specter v. Freed, 424 Pa. 508." (Emphasis supplied.)

Justice ROBERTS in his opinion in the *Specter v. Freed* case also recalled that Specter said he was operating under the City Charter, namely, "His (Specter's) sole contention is that §8-409 of the Philadelphia Home Rule Charter invests him with the subpoena power."

With these expressions of three Justices of the Court and with the recollection of others who were in the Courtroom at the time, I have no hesitation in stating that my ears did not betray me when they heard Mr. Specter say in November, 1966, that under the City Charter he was entitled to the subpoena powers for which he was contending. And I further have no hesitation in saying that Mr. Specter has attempted to deceive this Court and the people of Philadelphia in his Janus-like approach to this question as to whether his office of District Attorney does or does not come under the Philadelphia charter.

Specter's denial of what he said in November, 1966, places his credibility on the scales of appraisement. In seeking to determine his credibility in this litigation I refer to my Opinion filed in the case of *Specter v. Martin* on July 3, 1967. In that Opinion I referred to Specter's stupendous expedition which took him to Montreal to tour the Canadian World's Fair, without leaving his office or his home in Philadelphia. While still enjoying the shade under William Penn's hat on the tower of City Hall, he visited that world-renowned exposition on the banks of the St. Lawrence River. He did not restrict himself to generalities in describing that memorable visit. He did not merely post card a message: "Having a good time, wish you were here." He went into scientific and meticulous detail. He said

that he discovered that the World's Fair was "non-commercial" and projected "dignity and beauty and offers a wide range of subject matter that can best be categorized as the fulfillment of man's promise." Indeed, a splendid categorization, especially at a distance of 458 miles, without benefit of telescope, binoculars or ouija board!

Mr. Specter was so enthralled with what he saw on the banks of the St. Lawrence River while still enjoying the comforting breeze wafting between the Schuylkill and the Delaware, that he said his "emotions" were stirred and his mind was "stimulated". Was his mind similarly stimulated when he stood up in court here in Pittsburgh and denied the position he had so emphatically stated in November, 1966, in Philadelphia?

How can the Chief Justice conclude that Arlen Specter could be misled when Arlen Specter has stated that he has such brain power that, while cycling on the political paths in Philadelphia, he could simultaneously visit the Baseball Hall of Fame in Cooperstown, New York? The distance between Philadelphia and Cooperstown is not as great as that between Philadelphia and Montreal, but it is still a good 240 miles, too long for a summer afternoon's bicycle trip, but not, of course, impossible on a ouija board or Arlen Specter's magic carpet of fantasy.

This is the man that the Chief Justice says could be misled. This is the man who is a college graduate, a practising lawyer, a practising politician, a student, a trained investigator and a traveler (physical as well as mental). To say that Arlen Specter could be misled by court decisions is carrying farce to a pinnacle of jurisprudential burlesque.

Justice EAGEN said in his Dissenting Opinion in this case that Arlen Specter is "no babe in the woods." This is true but Justice EAGEN understated the situa-

tion.  Arlen Specter is a veteran jouster in the arena of life's practicalities.  He has demonstrated in his three appearances in this court on the subject matter before us that he is a skilled swordsman with eyes darting in every direction except toward the sanctity of the Charter he has sworn to uphold, the truth of his statements made in court, and the embarrassing position in which he has placed those who would like to admire him for his ability but are dismayed by his use of the district attorney's office, while the nominee of the Republican Party, for the mayoralty of Philadelphia to harass, threaten and menace his political foes, in defiance of every rule of propriety in the tradition of American fair play, whether it be on the tennis court or on the political diamond.

But, over and above all this, the calendar refutes categorically and devastatingly the Chief Justice's assertion that Arlen Specter was misled.  Even if Specter were a babe in the woods, or a barefoot boy in Montreal, he still would know something about the calendar.  Let us look at the chronology of events in this litigation.

On November 21, 1966, Specter appeared in our court and declared himself, as already noted, a city officer under the City Charter.  His opponents argued that he was a State officer and not entitled to the subpoena powers Specter was demanding.  Every communication medium, without exception, declared that our decision in that case *(Specter v. Freed)* would be decisive as to whether Specter was a city officer or state officer and this would determine whether he could be a candidate for mayor without resigning from the office of District Attorney.  Specter cannot possibly deny, despite his facility for denying in this litigation, that these were the facts of life.

While the decision in the *Freed* case was still pending, knowing full well the possibilities of that decision,

Specter filed his nominating petitions for Mayor on March 7, 1967. He certainly was not misled here because there was no law compelling him to file on March 7, 1967.

On March 11, 1967, the City Solicitor of Philadelphia notified the Finance Director of Philadelphia to stop Specter's salary as district attorney since he had failed to obey the dictates of §10-107(5) of the City Charter which required him to resign as District Attorney upon becoming a candidate for mayor. And the salary was stopped. Specter was not misled here. I do not know of a more effective way of conveying a message to a person that he is not entitled to the office he holds than to stop his pay!

On March 17, 1967, this Court declared that Specter was not entitled to exercise the subpoena powers he was demanding as a city officer. Two Justices of the Court, in that case, stated Specter was a city officer, and two others gave no opinion on whether Specter was a city officer, stating the question had not been justiciably raised, but the Chief Justice, who now says Specter was misled, declared emphatically that Specter was a city officer under the Charter and indeed said that Specter himself "necessarily agreed" because of what he was contending for, that he was a city officer. So, Mr. Specter was not misled up to this point.

So un-misled was Specter as to what was happening in the Court and as to what the communication media were saying, that he decided to go into Court to be assured of his salary as District Attorney. Accordingly, on March 21, 1967, he instituted an action of mandamus against the Finance Director of Philadelphia, demanding he be required to pay Specter his salary as District Attorney, incidentally, the salary paid him from the *City's* treasury. This Court decided that Specter was entitled to his pay since he was actually operating as district attorney, but the six-judge

court of that period divided evenly as to whether Specter was a city or state officer. Unfortunately, one of the members of the Court was ill at the time. However, in words as clear as letters emblazoned on the horizon a mile high, the Chief Justice said to Specter, in effect: You are a city officer, and you must, under the law, and according to the City Charter you have sworn to uphold, resign as district attorney if you wish to continue as candidate for mayor. As already stated, but it cannot be repeated too often, the Chief Justice declared on July 3, 1967: *"The Philadelphia Home Rule Charter Governs Specter and Requires Him to Resign."*

To say, with this kind of an irrefutable and uncontradicted record, that Arlen Specter was misled is simply to make a mockery of the English language. So positive was the Chief Justice that Specter had to resign in order to continue as candidate for mayor, that he indicated that Specter's conduct made him subject to dire penalties for refusing to resign. This is what the Chief Justice said: "I believe that the removal of the District Attorney of Philadelphia and the penalties imposable upon him are specifically provided for in and governed by Article X, §10-107(6) and §10-109, of the Philadelphia Home Rule Charter."

And then to make his point very clear he again took the Majority of the Court to the Procrustean table and enunciated: "However, in no event, even by the wildest *stretch*, can the above quoted provisions of Article VI of the Constitution change and transform the District Attorney of Philadelphia from a City Officer into a Commonwealth officer."

Today, as already stated, it is the City Charter which has been turned over to the tender mercies of Procrustes.

In his Opinion of today, the Chief Justice says that the result of the *Specter-Martin* case and the language

of the Court's opinion in the *Freed* case, was "doubt, uncertainty and bewildering confusion." There was no doubt and no uncertainty in the Opinions filed in those cases. Certainly not in the Chief Justice's Opinion which could not have been clearer if he had spelled out the facts of life to Arlen Specter in kindergarten blocks.

In his Opinion of today, the Chief Justice again declares, and correctly, that Specter is a city officer and must resign if he is to continue as a candidate for the mayoralty of Philadelphia. He not only states this for himself, but for the Court, namely: "THE MAJORITY OF THIS 7-JUDGE COURT AGREE WITH ME ON THIS POINT AND ARE CONVINCED THAT UNDER THE CONSTITUTION OF PENNSYLVANIA AND THE PHILADELPHIA HOME RULE CHARTER, THE DISTRICT ATTORNEY OF PHILADELPHIA IS A CITY OFFICER AND IS SUBJECT TO THE HOME RULE CHARTER." (Emphasis supplied).

In spite of this thunderous pronouncement, the Chief Justice says that Specter does not have to resign. He states that the ballot machinery is such that there can be no substitution on the ballot, if Specter refuses to resign. This is a gratuitous assumption on the part of the Chief Justice. Election Day is five weeks away. With the lightning speed of modern printing machinery, there would be no mechanical impediment whatsoever to getting the voting machine labels printed and prepared for November 7th. And then, so far as substitution is concerned, the machinery of the Republican Party is already set up for the nomination of a candidate in the event of the failure of a current nominee to qualify. The Chief Justice here has set up a straw man to knock down. I have made inquiries and I am reliably informed that there would be no difficulty whatsoever in printing the ballots with the name of a new Republican nominee for mayor, especially since no ballots have yet been printed.

490

But this is all academic discussion because Mr. Specter has stated publicly a number of times that if the Supreme Court rules he should resign as District Attorney in order to continue as candidate for mayor, he *will* resign. I believe that, in spite of the gap in Mr. Specter's credibility in certain statements he has made to this Court, we can be assured he will resign as district attorney to continue as candidate for mayor, if this Court says he must so resign.

The Chief Justice says that "unless this Court takes a position *forthwith* on Specter's status and rights, Philadelphia voters may be restricted to only one mayoralty candidate on a major party ticket." But here the Chief Justice states what is not possible because of what I have already pointed out about the Republican Party machine and the printing machinery of Philadelphia.

Then the Chief Justice states that "if Specter should be elected Mayor and is thereafter declared ineligible, it is clear that unless complete equitable relief is granted now," the majority of the voters. of Philadelphia will be disfranchised.

The simple answer to this proposition is that the people will not be disfranchised. What the Chief Justice states is that if Specter is elected illegally he must remain an illegal mayor because of what the Supreme Court has illegally said. This is not the law, and Heaven forbid it ever should be. A Court of October cannot say what a Court will say in January. In view of the backward somersault in the Chief Justice's position in this litigation between July and October, why could there not be a counter somersault between November and January?

Then the Chief Justice enumerates the terrible things which would happen to Philadelphia if Specter were to be declared illegally elected. And to avoid these terrible things the Chief Justice states we should

seat Specter in his illegality in October. This is about the most preposterous situation ever seriously presented in a court of law. In other words, if one illegally constructs a building on somebody else's property, he should be entitled to both the building and the land because of the trouble which would follow his being required to move a building from land not his own!

The Chief Justice says that if Specter's status is questioned in January, if he is elected, then the "orderly administration . . . of the Government of the City of Philadelphia may be jeopardized and partially paralyzed", and that "public interest and welfare" will be "seriously injured." But it is for these very reasons that we should decide the status of Specter's candidacy to-day! And what is the status? How can it be better stated than it is by the Chief Justice when he declares that Specter is a city officer and is bound by the City Charter? What the Court is doing in this decision is to dress Arlen Specter in a white suit of impeccability to hide the rags of illogic and illegality which have marred his appearance as a candidate up to this point.

The Chief Justice is troubled by this litigation. And so am I. But I am more troubled about the position the Chief Justice has taken when he says that "this case [is] as difficult as a Chinese puzzle." It does not need to be. The case is as simple and as easy to see as Niagara Falls. The Constitution of Pennsylvania says a district attorney is a county officer. The Constitution of Pennsylvania (Amendment XIV) declares that county officers shall become city officers. And the City Charter declares that city officers shall resign if they become candidates for offices other than those they currently hold. A succession of cascades of limpid English that any one who runs (especially if he is running for office) can read.

I wish to state at this point that my continued reference to the Chief Justice is not to be interpreted as

disrespectful. He is my friend and, in spite of what I have had to say here, I shall continue to be his friend. I must mention the Chief Justice particularly because there is apparently no Opinion of the Court in this case and so to individualize an argument I must mention that the Chief Justice says that the situation is "so confused and muddled," that he is going to cut the Gordian knot. The original Gordian knot, by the way, was tied by Gordius who attached the yoke of his chariot to the axle tree in such a manner that the ends of the cords could not be perceived. An oracle proclaimed that anyone who untied the knot would become emperor of Asia. Many hands tried to unfasten the knot but Alexander the Great whipped out his sword and cut the knot. History records that after he performed this feat, chaos followed in Asia. And that is what is happening in this case, with the Chief Justice cutting the Gordian knot instead of reasoning it loose and letting the strands straighten out in accordance with justice and law.

The Chief Justice ends his Opinion with the startling statement that to compel Specter to resign, if he wants to continue as candidate for mayor, "would be a gross miscarriage of Justice." And he follows this astonishing statement with an exclamation point. It is my firm opinion that to allow Specter to defy the charter under which he obtains all his powers is to deny justice to the people of Philadelphia. Three exclamation points!

By his conduct Arlen Specter is bringing discredit not only to the law but to the most cherished principle of American life respected everywhere, and that is fair play. He is using his district attorney's office to further his candidacy for another office. The Chief Justice himself pointed this out dramatically when he said that Specter's resignation is imperative because otherwise the district attorney "would be in a position to

unduly influence and to intimidate employees under his supervision, and might often neglect his official duties in the interest of his candidacy."

Who can doubt that Arlen Specter is giving maximum attention and devoting maximum time to pursuing his candidacy for mayor? Who can doubt that his staff is working in some form or another to advance that candidacy? Who can doubt that he has merged his official functions and duties as district attorney with that of his status as a candidate for mayor? Who can doubt that he intimidates his political foes with implied threats of harassing investigations, possible arrests and resulting freedom of movement? All, of course, in direct violation of the Philadelphia Home Rule Charter, the law as heretofore laid down by this Court, the law as declared, even in this decision of today, by a majority of the Court, and, above all, in ignominious desecration of the highest principle of American conduct, fair play.

It is simply incredible that this should be happening and this Court is doing nothing to stop so illegal, so inequitable, so unjust, so un-American a practice. The founders of the City Charter cannot help but be considerably distressed to see their Magna Charta of Philadelphia's liberties being used as an engine of political intimidation. Daily the district attorney appears on the political warpath, daily he fulminates against his political opponents, daily he uses the tremendous powers of his investigating forces to frighten those who might support his political adversary.

Of course, Specter has the right to attack his political opponent with political acumen and decorum, but when that attack moves inside the armor plate of a district attorney's tank, the people can be led to believe that it is as candidate for mayor, and not as district attorney, that Specter flies the banner of law and order. The framers of the Philadelphia Charter fore-

saw all this and declared in language that four members of this Court recognize, namely, that a district attorney may not merge an active campaign for an office other than that of district attorney and still remain as district attorney. Richardson Dilworth recognized this principle when he was a district attorney and became a candidate for office. He recognized this principle when as mayor he decided to become a candidate for governor. Arlen Specter recognized this principle in November, 1966, when he proclaimed to the world that he was a city officer under the City Charter, but he denounced this honorable principle when his ambitions took him into a candidacy for mayor, and his mendacious trip to Montreal. He is entitled, of course, to further his ambitions and it would not disturb me to see a person in any position other than district attorney campaigning for office, but the district attorney's office is distinctly one of prosecution and, when prosecution, or threat of prosecution, is linked with an attack on the district attorney's political foes, the prosecution becomes persecution, which has no place on the sunlit field of fair and honorable political conflict.

And now, the saddest thing of all must be said: THE PHILADELPHIA HOME RULE CHARTER IS DEAD! And the mortal blow has been struck by the Supreme Court of Pennsylvania. After the decision in this case no section of the charter is safe. Four members of a 7-Judge Court have declared that one of the most salient features of the Charter is sacrosanct and it must be obeyed. Then four members of a 7-Judge Court solemnly declare that the Charter must *not* be obeyed. Since the Supreme Court has ordered that a valid legal section of the Charter is to be *disobeyed,* no possible inviolability can ever judicially attach to the Charter again.

And now, even a sadder thing must be said. The Supreme Court of Pennsylvania, through a majority of the judges thereof, have struck a blow at the dignity, the prestige of this Court, a blow whose damage may be irreparable, unless, soon, this Court recognizes its responsibility to the law and to the welfare of the people by overturning and repudiating the unconscionably self-contradictory order it hands down today.

The principal person in this litigation is well named —Specter. The decision in this case will remain a specter to haunt this Court throughout its entire future history, unless, of course, the ghost is laid to rest with a rectification of the disastrous mistake made today.

Obviously there have been many instances where this Court, and every multiple-judge court in the land, has divided in opinion on an important subject litigated before it. But this is the first time, and I challenge anyone to declare factually the contrary, where the majority members of a court declare what the law is and then imperiously orders that that law be ignored. And that is what this Court has done today.

By so doing, the majority of this Court has accomplished many melancholy results:

It has undermined confidence in the Supreme Court of Pennsylvania;

It has placed an inglorious blemish on this Court which is the oldest Supreme Court in the United States;

It will cause lawyers to wonder, and litigants to worry, as to whether their litigated causes receive attention on the arguments advanced in behalf of the respective contending parties or whether the decisions are rendered arbitrarily, whimsically, or haphazardly;

It has made a shambles of the law of precedent, and the entire educational system of instructing future lawyers on how to prepare for the exercise of their noble profession;

It has introduced into the orderly administration of the law imponderables which cannot be evaluated or appraised. There can be no denial that a judge sometimes, because of opinions he has written or because of his life's philosophy which is well-known, evinces a certain predilection on which lawyers calculate. For instance, analysts are constantly endeavoring to predict decisions of the Supreme Court of the United States on the basis of what its judges have previously said. But in this case, the predilections, philosophy and attitude on the law by the Chief Justice have been expressed in two opinions, not of years ago but practically of yesterday. Indeed, even today the Chief Justice affirms that interpretation of the law. The Chief Justice, in effect, laid down the LAW OF THE CASE in this litigation. And yet, in spite of these solemn confirmations, the Chief Justice orders that his own proclaimed law must not be obeyed! This character of arbitrary ordering can only lead to disorganization, dismay and eventual disappearance of respect for law, and when that happens, the downfall of our democratic institutions is threatened.

I have written many dissenting opinions in my incumbency on this honored and honorable court, but if all my dissenting opinions of the past were rolled into one, they would form only a slight abrasion of distress compared to the gaping wound of sorrow I experience in writing this dissenting opinion.

I am desolate that I have had to say what I have written here about the Chief Justice who has been my friend ever since I donned the robes of Justice of this Court. I hope he will understand that my respect for the law and my conscience as a loyal American citizen cannot permit me to be silent. Edmund Burke has said that for wrong to prevail it is only necessary that those defending the right remain silent. It is for this reason that I have written as I have, because, in my 35

years as a judge I have never known a decision which was so wrong as the one handed down today, nor have I sat on a case where duty more compelled me to speak as I have spoken.

In view of the footnote at the end of the Chief Justice's opinion I hereby state as an irrebuttable physical printing fact that there would be no difficulty in preparing the ballots for the November election, with a proper substitution, and I state further that the Chief Justice's assertion about difficulty in printing cannot be substantiated.

I am compelled also to make an observation on Justice ROBERTS' Concurring Opinion. He says that *Specter v. Freed* decided that Specter was a state officer. It did not. Three judges held that Specter was a state officer, two held that he was a city officer, and two held that the only question in the case was whether Specter had certain subpoena powers, and did not pass judgment on Specter's status under the City Charter.

Justice ROBERTS is equally in error when he says that *Specter v. Martin* says that Specter was a state officer. Three judges in that case held Specter was a city officer and three held he was a state officer. An equal division cannot possibly decide a question.

It was because of the indecision in the *Martin* case that this matter came before us again. And now, in the present decision, which, naturally, is the controlling one, FOUR Justices declare mathematically, specifically, and without equivocation that Specter is a CITY OFFICER. Any one who can read can see that Chief Justice BELL, and Justices MUSMANNO, COHEN and EAGEN, declare that Specter is a city officer, and is bound by the City Charter which declares Specter must resign as district attorney upon a declared candidacy for any other office.

Thus, without "verbal histrionics, legal irrelevances, or judicial smokescreens," this Court by its order de-

fies mathematical computation, makes, I repeat, a shambles of the City Charter, and strikes a devastating blow at the prestige of the Supreme Court of Pennsylvania.

---

DISSENTING OPINION BY MR. JUSTICE COHEN:

The Chief Justice holds the District Attorney to be a City Officer but—for reasons unstated, though apparent—refuses to apply the sanctions required by the City Charter when its provisions are violated and disregarded.

The only position that enlists a majority of this Court determines that the District Attorney is a City Officer. Our refusal to invoke the required sanctions is an act of favoritism that denies the plaintiff litigant due process and hence is unconstitutional. I hold the involved officer to be a city one and I would invoke the required sanctions.

I dissent.

---

DISSENTING OPINION BY MR. JUSTICE EAGEN:

Four of the seven members of this Court, including myself, are convinced that Arlen Specter is subject to the provisions of the Philadelphia Home Rule Charter and that, as a matter of law, he may not be a candidate for Mayor because he has refused to resign as District Attorney.

The Chief Justice, who shares this view, is reluctant to direct that Mr. Specter's name be stricken from the ballot as a candidate because he feels that previous decisions of this Court misled Mr. Specter. With this I cannot agree. Mr. Specter is no babe-in-the-woods. It was his own conscious attempts to evade the clear provisions of the Charter that gave rise to the unfortunate situation now existing.

Assuming, however, that Mr. Specter was misled in the past, as the Chief Justice believes, he cannot possibly be confused any longer. The law is now clearly defined. Hence, Mr. Specter, who is not above the law, should either withdraw as a candidate or resign as District Attorney. The choice is his. In order to avoid all possible inequities, however, I personally would give him a reasonable time in which to choose.