Richard H. Gwinn, Plaintiff-Petitioner, *v.* Robert P. Kane, et al., Defendants-Respondents.

Argued March 4, 1975, before President Judge Bow-
man and Judges Crumlish, Jr., Kramer, Wilkinson,
Jr., Mencer, Rogers and Blatt.

*Edwin P. Rome,* with him *Jerome R. Richter, Norman
Perlberger* and *Blank, Rome, Klaus & Comisky,* for plain-
tiff-petitioner.

*Michael L. Levy,* Assistant Attorney General, and *Mark A. Klugheit,* Assistant Attorney General, for defendants-respondents.

OPINION BY PRESIDENT JUDGE BOWMAN, May 27, 1975:

Cross-motions for summary judgment posture the legal issues raised in this action in quo warranto by which plaintiff, Richard H. Gwinn, seeks to void an indictment charging him with perjury and false swearing. To accomplish this objective, plaintiff, by this action, attacks the office held by Walter M. Phillips, Jr., the role two of his subordinates played in the investigation and presentment leading to plaintiff's indictment and the role they expect to play in the trial of plaintiff under the criminal justice system of our Commonwealth.

As history readily reveals, departures from the traditionally sanctioned and recognized forms and procedures of our criminal justice system and the role particular public officials are to play therein produce complex multiple litigation, and the genesis for such departures is not found in orderly processes to improve the system but rather arises out of political controversy. The departure with which we here deal is no exception.

Supporting their respective motions for summary judgment, affidavits have been filed by the competing parties. Having carefully reviewed them, we observe, as the parties themselves believe to be the case, that they produce no *material* controverted facts and, therefore, we believe the case to be ripe for disposition on the cross-motions. The background history essential to an understanding of the issues raised dates back to the year 1972, when an investigating grand jury was convened by the then District Attorney of Philadelphia County and charged to look into a wide range of subjects revolving around political and police corruption. On November 20, 1973, plaintiff, as president of a milk company, testified

before that grand jury on the subject of contracts between his milk company and the City of Philadelphia over a number of years.

In January 1974, that grand jury issued its final report, which, among other things, recommended a new investigating grand jury be convened to continue in the areas of investigation with which it had been charged. On January 31, 1974, Judge TAKIFF, who had been assigned to supervise the regular January 1974 Grand Jury, charged it to conduct an investigation in a host of areas, which included "systems of bribery and corruption in the awarding of public contracts" and "a system or systems of official corruption, including and involving payments to influence the discharge of official duties with respect to decisions, recommendations, appointment to official positions, and other governmental functions and activities."[1] (Hereafter referred to as 1974 Grand Jury.)

On February 11, 1974, the 1974 Grand Jury was reconvened and the newly elected District Attorney was requested by Judge TAKIFF to assign personnel to it, which request was refused.

By letter dated February 15, 1974, President Judge JAMIESON of the Court of Common Pleas of Philadelphia County requested the then Attorney General of the Commonwealth to assign a "special attorney or attorneys to represent the Commonwealth" in connection with the work of the 1974 Grand Jury. In doing so, he specifically invoked Section 907 of The Administrative Code of 1929, Act of April 9, 1929, P. L. 177, 71 P. S. §297.

In replying on February 26, 1974, the Attorney General suggested that good judgment would dictate a judicial determination of the legality of the 1974 Grand Jury,

---

1. As set forth in the opinion of the Pennsylvania Supreme Court in *In re Investigation of January 1974 Philadelphia County Grand Jury*, Pa. , 328 A.2d 485 (1974), in which case the legality of said grand jury was sustained.

which he would seek if Judge TAKIFF or District Attorney Fitzpatrick declined to do so.[2]

On March 26, 1974, the Attorney General appointed Walter M. Phillips, Jr., as a "deputy attorney general" for the Commonwealth; a commission for said appointment issued April 1, 1974.

On March 26, 1974, having made such appointment, the Attorney General directed Mr. Phillips to "set up the Office of Special Prosecutor" to continue an investigation into corruption within the Philadelphia Police Department which had been started by the Pennsylvania Crime Commission; a report of the Commission on the subject having issued March 11, 1974.

On March 28, 1974, the Attorney General notified the District Attorney that he was superseding the District Attorney in the task of investigating and prosecuting police corruption in Philadelphia and that all such allegations of corruption should be referred to the "Special Prosecutor Walter M. Phillips, Jr."

On May 1, 1974, the Attorney General advised President Judge JAMIESON that he was complying with the judge's request of February 15, 1974, and "directing the Special Prosecutor and his staff to man the TAKIFF Grand Jury and to proceed without delay." Neither in this advice nor in any other manner as disclosed by the record before us did the Attorney General otherwise define the scope and authority of Mr. Phillips.

On September 11, 1974, the 1974 Grand Jury issued a presentment, and on September 26, 1974, the September 1974 Grand Jury approved the indictment of plaintiff for perjury and false swearing. Trial of the charge was scheduled to begin March 3, 1975, before Judge KUBACKI,

---

2. *See In re Investigation of January 1974 Philadelphia County Grand Jury, supra. Also see Packel v. Takiff,* 457 Pa. 14, 321 A.2d 649 (1974), in which our Supreme Court denied a petition for declaratory judgment by order dated July 1, 1974.

which impending trial precipitated the instant proceedings.

There is a body of averments by plaintiff supported by affidavits and exhibits, and largely uncontradicted by defendants, on the subject of financing the office of the "Special Prosecutor" through Law Enforcement Assistance Administration (LEAA) funds. For reasons hereinafter set forth, we do not deem this body of averments to be material to the issues raised on the cross-motions for summary judgment. To the extent that this body of averments may be material to identify and define the office which Mr. Phillips holds and the role he played in leading to the indictment in question, it may be fairly said that with respect to the Attorney General's application for and in support of attaining LEAA funds, Mr. Phillips was repeatedly identified as a "State Prosecutor" with statewide power and authority to combat public corruption. Similarly, there are averments that two aides of Phillips (Messrs. Klugheit and Cole), each appointed by the Attorney General as an "Assistant Attorney General, Department of Justice," participated in the proceedings leading to the indictment of plaintiff prior to their admission to practice before the bar of the Supreme Court of Pennsylvania.

These averments we likewise consider not to be material to resolution of the issues before us.

As thus postured, it is quite clear that plaintiff is essentially testing the legality of the office which Mr. Phillips holds and his actions under its color rather than Mr. Phillips' entitlement to that office. Although not specifically raised by either party in their cross-motions for summary judgment, it seems equally clear to us that our initial inquiry must be directed to the question of whether an action in quo warranto lies to test the legality of a public office. Inasmuch as the vast body of law arising out of quo warranto actions involves issues of a particular person's entitlement to a public office, our research dis-

closes that this question has rarely been raised. However, it does appear to be well settled that where a person has entered upon a public office, which office is allegedly unconstitutional, quo warranto is the proper proceedings to oust the incumbent because the office he occupies has no legal existence. *Commonwealth v. Denworth,* 145 Pa. 172, 22 A. 820 (1891); *Snyder v. Boyd,* 26 Dauph. 375 (1923). If a public office having no legal existence because of the unconstitutionality of the statute creating it is a proper subject of quo warranto proceedings against the incumbent, we see no valid distinction for denying to quo warranto the testing of the legality of a public office for alleged want of statutory authority to create it. *Cf. Gernert v. Lindsay,* 2 Pa. Commonwealth Ct. 576, A.2d (1971). We, therefore, conclude that an action in quo warranto properly lies in this case. Does plaintiff have standing to sue the defendants in an action in quo warranto? Defendants vigorously assert that plaintiff as a defendant in a criminal prosecution has no standing to contest the validity of the office prosecuting him.[3]

In *Mayer v. Hemphill,* 411 Pa. 1, 190 A.2d 444 (1963), a taxpayer's action in equity, an issue raised was whether quo warranto was not the exclusive remedy to resolve the issues raised by plaintiff's complaint. In concluding that equity would lie, our Supreme Court discussed the roles of these two forms of action. It stated:

> "The general rule is well settled that quo warranto is the sole and exclusive remedy to try title or right to office, whether the right which is challenged is that of a de jure or a de facto officer. It is likewise part of the general rule that quo warranto can be brought only by an Attorney General, or by a District Attorney, or by a person who has a special right

---

3. In his amended complaint, plaintiff also alleged himself to be a citizen of the Commonwealth, a fact in the context of this case which we believe neither enhances nor detracts from his standing to sue.

or interest as distinguished from the right or interest of the public generally, or has been specially damaged. And this is particularly true where such a judgment would not place the plaintiff himself in office.

"However, there is likewise a well settled general rule that a taxpayer has a right and a standing to sue to enjoin public officials from wrongfully or unlawfully expending public money, and in such cases the complainant need not have any special interest which is damaged other than his interest as a taxpayer.

"Sometimes these two general rules collide or overlap. Moreover, appellant points out that in recent years *exceptions* have been wisely recognized by the Courts to the narrow circumscribed limited remedy of quo warranto for several reasons: (1) quo warranto does not always furnish an adequate and full remedy; (2) the wisdom of applying a remedy which will avoid a multiplicity of suits; (3) the paramount right of the public to have a surer and more adequate remedy to restrain wrongful acts by a public official, including the unlawful expenditure of public money. Where such circumstances exist, equitable relief has been granted through a taxpayer's bill or other injunctive or equitable remedy." (Emphasis in original.) (Citations omitted.) 411 Pa. at 6-7, 190 A.2d at 446-47.

*Also see League of Women Voters v. Lower Merion Township Board of Commissioners,* 451 Pa. 26, 301 A.2d 797 (1973); *DeFranco v. Belardino,* 448 Pa. 234, 292 A.2d 299 (1972).

As particularly pertinent to the issue of the right of an individual to sue in quo warranto, noted as an exception to the general rule in *Mayer, supra,* our Supreme Court in *Stroup v. Kapleau,* 455 Pa. 171, 313 A.2d 237 (1973), affirmed this Court which concluded that several state senators had a right through quo warranto proceedings to test certain gubernatorial appointments. It said:

"The first issue raised is whether the appellants had standing to commence this action in quo warranto. The Commonwealth Court held that they did and we agree. An action in '[q]uo warranto can be instituted to determine the title to public office only by the Attorney General, the District Attorney *or a private individual who has a special interest* as distinguished from the interest of the public generally.' Commonwealth ex rel. Specter v. Martin, 426 Pa. 102, 108, 232 A.2d 729, 733 (1967) (emphasis added). In Commonwealth ex rel. Schermer v. Franek, 311 Pa. 341, 166 A. 878 (1933), this Court stated: 'To invoke the issuance of a writ of quo warranto the relator, therefore, must show in himself an interest in the controversy. . . . *He must possess some peculiar, personal interest* aside from his general interest as a member of the public.' *Id.* at 345, 166 A. at 879 (emphasis added). Article IV, section 8(a), of the Pennsylvania Constitution provides: 'The Governor shall appoint an Attorney General, a Superintendent of Public Instruction and such other officers as he shall be authorized by law to appoint. The appointment of the Attorney General, the Superintendent of Public Instruction and of such other officers as may be specified by law, *shall be subject to the consent of two-thirds of the members elected to the Senate.*' (Emphasis added.)

"Under the above constitutional provision, each member of the Senate has an individual right to confirm or reject certain gubernatorial appointments. Each Senator has an interest in such appointments aside from that Senator's interest as a member of the general public. We, therefore, conclude that the appellants in this case, all members of the Senate of the Commonwealth of Pennsylvania, had standing to commence this action in quo warranto." (Emphasis in original.) 455 Pa. at 174, 313 A.2d at 238-39.

On the facts with which we are here confronted, we are of the opinion that plaintiff has standing to bring this

action in quo warranto as an individual who has a special interest in testing the very legality of the office itself; an interest clearly apart from that of the general public and ont in which he is directly and realistically involved. Standing indicted through the action of and the role played by Mr. Phillips in the criminal justice system producing such a result, plaintiff has a very real and peculiar interest. Furthermore, it is beyond cavil to believe that the Attorney General or, indeed, the District Attorney of Philadelphia County, in light of the roles they have played in this matter, would seek the ouster of Mr. Phillips or question the office to which he has been appointed by the Attorney General himself.

We now reach the fundamental issue raised by the parties in their cross-motions for summary judgment—the legality of the office held by Walter M. Phillips, Jr.

Plaintiff argues that the office of "Special Prosecutor" is a mythical entity without authority in law for its very existence. It may well be, if we were here confronted solely with the issue of whether an Attorney General under his common law power or that conferred by statute may create such a statewide office. *Smith v. Gallagher*, 408 Pa. 551, 185 A.2d 135 (1962), may be persuasive authority for concluding that he connot. Contrary to plaintiff's assertion, however, *Smith* has little bearing upon the issue before us. In that case, a president judge appointed a special prosecutor without seeking the cooperation or aid of the Attorney General and ordered the district attorney superseded. In an extraordinarily long and wide-ranging opinion, the Court concluded that the action of the president judge was without authority in law, statutory or otherwise.

In this case, there is no assertion by the defendants that the Attorney General, in appointing Mr. Phillips, acted under any asserted common law power or authority. Nor can plaintiff so assert on this record. The legality of the office Mr. Phillips occupies and his actions thereunder

as directed against the plaintiff must be tested within the framework of the statutory law pursuant to which he was appointed.

Section 907 of The Administrative Code of 1929, Act of April 9, 1929, P.L. 177, 71 P. S. §297, provides in pertinent part as follows:

"When the president judge, in the district having jurisdiction of any criminal proceedings . . . in this Commonwealth, shall request the Attorney General to do so, in writing, setting forth that, in his judgment, the case is a proper one for the Commonwealth's intervention, the Attorney General is hereby authorized and empowered to retain and employ a special attorney or attorneys, as he may deem necessary, properly to represent the Commonwealth in such proceedings, and to investigate charges, and prosecute the alleged offenders against the law. Any attorney, so retained and employed, shall supersede the district attorney of the county in which the case or cases may arise, and shall investigate, prepare, and bring to trial the case or cases to which he may be assigned."

It was pursuant to this statute that President Judge JAMIESON sought the intervention of the Attorney General and it was under the authority of this statute that the Attorney General acted in appointing Mr. Phillips as a deputy attorney general and advised the District Attorney that he was being superseded by the appointee for the purposes of the appointment.

We then return to the significance which plaintiff appears to attach to the several titles employed in designating the office to which the appointee was named and used by him in performing the duties of said office. As previously noted, whatever representations have been made by the Attorney General to qualify the office of "Special Prosecutor" for LEAA funds, have only tangential significance in this case, and whether, in doing so, the Attorney General properly acted, is certainly not before us. We

recognize, of course, that the Attorney General in responding to Judge JAMIESON'S request also employed the phrase or described the office of Mr. Phillips as "Special Prosecutor" in several instances, but we can attach no controlling significance to such nomenclature so long as Mr. Phillips acted within the scope of his appointment pursuant to the statute authorizing the same. It may well be that attempts by Mr. Phillips to exercise authority as Special Prosecutor on a statewide basis, is beyond the scope of the statutory authority of his appointment. As this record discloses, however, Mr. Phillips in performing the duties of his office directed against the plaintiff here, acted in his capacity as a deputy attorney general.

In doing so, was he acting within the scope and authority of his appointment pursuant to the statute under which he was appointed? Our reading of section 907 of The Administrative Code of 1929, 71 P. S. §297, leads us to the conclusion that it was fit and proper for President Judge JAMIESON to seek the appointment of a special attorney or attorneys to meet the problem with which he was confronted, notably the refusal of the incumbent district attorney to staff the 1974 Grand Jury, the validity of which has now been judicially determined. *In re Investigation of January 1974 Philadelphia County Grand Jury, supra.* We further believe that the statutorily permissible scope of authority of the appointee pursuant to section 907 is coextensive with the purposes and responsibilities of the 1974 Grand Jury as charged by Judge TAKIFF. In the language of the statute, "the case is a proper one for the Commonwealth's intervention," in which event the appointee supersedes the district attorney and is authorized to "investigate charges, and prosecute the alleged offenders." As applied to this case, Mr. Phillips has investigated and is prosecuting charges against plaintiff. The charges in question are clearly within the scope of the purposes and responsibilities of the 1974 Grand Jury as charged by Judge TAKIFF, either as

concerned with a "system of bribery and corruption in the awarding of public contracts" or the more broadly worded purpose of investigating "a system or systems of official corruption, including and involving . . . governmental functions and activities." We recognize, of course, that the indictment against plaintiff is for perjury and false swearing, but the record seems clear that it is directly related to, or an outgrowth of, an investigation within the scope of the 1974 Grand Jury investigation.

We thus conclude (a) that Mr. Phillips, appointed under section 907 as a deputy attorney general (special attorney), was appointed to a lawful office for a proper and lawful purpose, (b) that, in exercising the powers and authority of said office as directed against plaintiff, he was acting within the scope of his authority, and (c) that, in his activity leading to a presentment against, and indictment of, plaintiff, he did not exceed either the scope of the authority of his office or his powers thereunder.

In so concluding, we do not pass upon either the legality of any office of Special Prosecutor, which Mr. Phillips may assert he holds, or of any actions or activity he may have carried on or performed under its color. Nor, regardless of the asserted title or titles of the office which he enjoys by reason of his appointment under section 907 of The Administrative Code of 1929, 71 P. S. §297, should our opinion in this case be construed to have afforded a carte blanche to Mr. Phillips to supersede the District Attorney of Philadelphia County beyond the confines of the purpose of his appointment.

Finally, plaintiff has advanced two arguments which we believe are misplaced for the purpose of this litigation. As previously noted, whether LEAA funds were properly obtained to finance Mr. Phillips' office for the purposes we here approve or for a broader purpose, is not, in our opinion, relevant to the issues here raised. Nor do we believe that the issue of two of his subordinates allegedly having participated in proceedings leading to plaintiff's

indictment prior to their being admitted to practice in Pennsylvania, is material to testing the legality of his office. These matters are properly the subject of other proceedings, not this one.

Accordingly, we enter the following

ORDER

NOW, May 27, 1975, plaintiff's motion for summary judgment is hereby denied. Defendants' motion for summary judgment is hereby granted, and judgment is entered in favor of defendants and against the plaintiff. Our prior stay of proceedings is hereby vacated.

--------

DISSENTING OPINION BY JUDGE CRUMLISH, JR.:

I reluctantly and respectfully dissent.

Initially, I speak to those areas wherein I agree with majority's most ably articulated opinion.

Quo Warranto, as the majority states, is most certainly the proper method by which the legality of public office is challenged. I have little difficulty in joining in the proposition that the evolution of this form of action dictates its extension to include challenges to legality of office. *See generally, Commonwealth v. Denworth,* 145 Pa. 172, 22 A. 820 (1891) ; *Gernett v. Lindsay,* 2 Pa. Commonwealth Ct. 576,      A. 2d      (1971) ; *Snyder v. Boyd,* 26 Dauph. 375 (1923).

Similarly, I am convinced that this Plaintiff has standing to complain in Quo Warranto for common sense clearly dictates that one who is currently under the threat of loss of liberty, reputation and economic survival has a very special interest distinct from that of the general public. Indeed, I simply cannot picture a party more directly and uniquely affected by the conduct of one who is occupying a potentially invalid office. To deny standing here would constitute an injustice of the greatest magnitude. *See Stroup v. Kapleau,* 455 Pa. 171, 313 A.2d 237 (1973).

There are fundamental areas, however, wherein I must disagree or at least express my notions.

First, I take the position that this case is not ripe for disposition on the cross-motions for summary judgment. The majority's review of the motions and supporting affidavits leads it to the conclusion that there are no material controverted facts which must be disclosed in order to dispose of the cross-motions. Notwithstanding agreement of counsel, there is a serious absence of vital information which this Court, and the Supreme Court on review, must have at hand in order to summarily determine the merits of this Quo Warranto action. For one example, the record we read does not contain the 1972 Grand Jury presentments. From the record, all that is known of Plaintiff is that he was the president of a dairy who testified before the 1972 Grand Jury. Unresolved is the question of whether his alleged perjured testimony went to any of the twenty-one unknown presentments. How on this alone, can a reasonably objective man conclude that the alleged false testimony related to "systems of corruption by public officials" or "to payments to influence the discharge of official duties" which was within the area of inquiry of the 1974 Investigating Grand Jury?

In spite of Counsel's agreement, this Court can and should have before it all of the evidence required to determine Quo Warranto on its merits. It should also be noted that much documentary evidence is readily available which tends to show the scope of authority of the office which Mr. Phillips professes to hold, or at least the authority believed by Mr. Phillips to be inherent in the office. The record should disclose with more specificity the official federal and state recognition of the office as Special Prosecutor as well as news media acceptance, office stationery, legal pleadings and the physical accommodations used by the staff. Such an inquiry would leave little doubt as to the true purpose underlying the establishment of this office.

Next, I must emphatically reject the majority's conclusion that *Smith v. Gallagher*, 408 Pa. 551, 185 A. 2d 135 (1962) has little bearing on the issues presently before us. In *Smith*, Justice MUSMANNO had before him several issues, to wit:

1. The asserted improper empanelment of a Special Grand Jury;

2. The asserted illegality of the office of Special Prosecutor;

3. The asserted overbreadth and consequential illegality of the attendant investigation; and

4. Judicial participation in, and implementation of, the Special Grand Jury and the choice of a Special Prosecutor.

I recognize that there the principle issue narrowed to the propriety of the method by which a Special Grand Jury was empanelled, and that is not relevant, *per se,* to our present deliberation, but, that ruling does in a substantially significant part directly concern the legality of the office of Special Prosecutor in Pennsylvania, and enunciates judicial interpretation of the proper course to be followed to reach the awesome end of supersession.

Justice MUSMANNO, after his analysis and prophetic dissertation on the antiquated complexities of the Philadelphia Judicial System in effect at that time, and its relationship to the improper convention of the Special Grand Jury, made several cogent points relevant to our deliberations in the present case. The first of these points he expressed as follows:

"This is not the place to discuss reorganization of the courts of Philadelphia County, but it is to be hoped that proper constitutional action will be taken to dissolve the seven individual courts of Philadelphia and amalgamate them into one court of common pleas, with one president judge, who will have authority to assign the judges to the various departments of work and to schedule the court's business so as to remove all

overlapping or collision of effort and endeavor, creating in the end a homogeneous, close-knit, harmonious working court.

*"Had there been one president judge having administrative direction over all judges assignable to the criminal courts of Philadelphia County when the Leonard petition was filed, he would have decided, after consultation, of course, with the whole body of judges, whether he should call upon the Attorney General of the Commonwealth,* under the Act of April 9, 1929, P. L. 177 (Administrative Code of 1929, P. L. 177, §907, 71 P.S. §297, which provides, inter alia:

'When the president judge, in the district having jurisdiction of any criminal proceedings, before any court of oyer and terminer, general jail delivery, or quarter sessions, in this Commonwealth, shall request the Attorney General to do so, in writing, setting forth that, in his judgment, the case is a proper one for the Commonwealth's intervention, the Attorney General is hereby authorized and empowered to retain and employ a special attorney or attorneys, as he may deem necessary, properly to represent the Commonwealth in such proceedings, and to investigate charges, and prosecute the alleged offenders against the law. Any attorney, so retained and employed, shall supersede the district attorney of the county in which the case or cases may arise, and shall investigate, prepare, and bring to trial the case or cases to which he may be assigned.'

*"The lack of a single coordinating president judge in the Philadelphia district, however, did not suspend the applicability to Philadelphia of the quoted Act. The duty still devolved on Judge Alessandroni to take up with the other judges of the court the question as to whether, under the circumstances presented to him, the Attorney General should be requested to supersede the district attorney.* Instead of considering this defini-

tive procedure, Judge ALESSANDRONI acted on his own volition and displaced the district attorney. A displacement of this character, even if only partial and temporary, is a serious and solemn matter. The learned judge treated it with a casualness which amounted almost to unconcern." (Emphasis added.)

*Smith v. Gallagher, supra,* 408 Pa. at 565-66, 185 A. 2d at 142. The Court continued by saying, "when he [the president judge] treated with aloofness the provisions of the Act of 1929, . . . he abused his discretion. *Smith v. Gallagher, supra,* 408 Pa. at 567, 185 A. 2d at 143.

The significance of his words is unmistakable. Whether there are several courts of common pleas, each having a President Judge, or a single court system where there is speaking for the court one President Judge, *Smith* clearly directs that in a matter with such grave consequences as the supersession of a local district attorney, using the prerogative duly afforded him by Section 907 of the Administrative Code of 1929, Act of April 9, 1929, P.L. 177, 71 P.S. §297, the President Judge should consult with the other judges of his court prior to submitting his request to the Attorney General.

Here, this mandate was ignored. Judge JAMIESON, then the President Judge, asked supersession when the District Attorney of Philadelphia, for reasons publically asserted and clearly within his discretion, refused to staff the resurrected Grand Jury. Justice MUSMANNO, when writing *Smith*, obviously thought and interpreted Section 907, 71 P.S. §297 to mean, that one judge's judgment is not of necessity reflective of the thoughtful and considered deliberations of the entire Board of Judges. He saw the President Judge as a Chairman of the Board whose word expressed the view of the Board. Neither he, nor I, can believe that the Legislature ever intended to give one man this unparalleled judicial privilege or responsibility.

*Smith* is relevant in another way to this Quo Warranto action. The Supreme Court also said "when he ap-

pointed a 'Special Prosecutor' he [the President Judge] attempted the impossible because he was making an appointment to a phantom office," *Smith v. Gallagher, supra,* 408 Pa. at 567, 185 A. 2d at 143, and the Court going forward wrote, "[a]s already stated, there is no public office in Pennsylvania known as Special Prosecutor." *Smith v. Gallagher, supra,* 408 Pa. at 480, 185 A. 2d at 149.

I respectfully reject the rationale posed which argues that the title of either Special Prosecutor or Deputy Attorney General is an immaterial and collateral argument. I submit that there is a clearly defined demonstration of intention in defining the terms. *Smith* specifically invalidated the office of Special Prosecutor and the concept of a special attorney with powers beyond the localized ones conferred upon it by statute. The use of the term Special Prosecutor, considering its legislative confinement, should serve as an interpretive guide in determining the purpose of the office.

Likewise, application to the Law Enforcement Assistance Administration (LEAA) for funding of the office shows an intent to form a statewide office of the Special Prosecutor in violation of the mandate of the concept of the office as proposed by the Act of 1929 which Mr. Phillips now, in fact, argues is the birthright of his operation. Charles Rinhevich, then Regional Administrator of LEAA for Philadelphia, by affidavit, described his understanding of the nature of the office and the application for funding for the office by the Attorney General when he stated *inter alia*:

"A.  That state-wide Special Prosecutor's office should address corruption at all levels of the criminal justice system (including the courts and corrections) and not just police.

"B.  There would need to be a commitment of state resources to support the Special Prosecutor's office. I would expect this commitment to be in the form of

dollars as well as the kind of support that is evidenced by the submission of proposed legislation from the Governor to the State Legislature which would create the Special Prosecutor's office on a permanent basis."

The affidavit in its entirety reflects exhaustive consideration of the scope of the activity which was to be undertaken, and unmistakably points to a *statewide* concerted, long range effort to eliminate corrupt law enforcement. I have no difficulty in seeing that this is inapposite to the Commonwealth's present plea which relies on Section 907 of the Administrative Code, 71 P.S. §297, that there now exists merely a Special Deputy Attorney General superseding one local district attorney for a limited inquiry into local matters. Surely this finding must bear some relevance to the authority which Section 907 intended.

To me, it is unmistakably clear when one reflects on the totality of events which surround the creation of this office that there has been an attempt to establish an office of Special Prosecutor which, by its terms, violates the pronouncements of *Smith*.

In this vein, it might be well to point out that Section 907 places definite restraints on the breadth of the power enjoyed by a special attorney superseding a local district attorney. The Legislature, in enacting the provision, obviously was aware of the awesome power it was unleashing in supplanting a public official elected by local voters with a special attorney who neither himself, nor his superior, the Attorney General, is accountable to the local electorate. Mr. Phillips' power, it seems to me, by definition can extend no further than the geographical confines of Philadelphia County because the powers of the district attorney of that county are geographically limited. When a special attorney is appointed whose powers affect rights of people to whom he is not electorally responsible, the definition of his powers should be precise, both as to geographical and substantive boundary. His commission, and the attendant documents setting forth his duties as

the agent of the Attorney General in the supersession, should be specific, beyond doubt or misinterpretation. This is not so here. The present special attorney appears to enjoy a mandate coextensive with the mandate of the 1974 Philadelphia Investigating Grand Jury, while at the same time he pursues investigations and prosecutions on a state-wide basis. Not only are the rights of citizens, who are the object of pursuit of a roaming prosecutor acting in excess of his authority adversely affected, but what of the rights of the citizens who have elected an individual to represent their interest in the District Attorney's office of each county which has been invaded by this "phantom"?

One final question remains which has eluded the majority. Throughout this exceedingly long and complex morass of litigation, there has been the persistent argument that questioning the validity of an indictment by seeking civil relief in Quo Warranto is inappropriate. I am of the view that this is a proper and correct procedural remedy. Recent federal cases have decided that motion to dismiss an indictment may be granted on the grounds of the lack of authority, or overextension of a commission by a federal Special Prosecutor under authority of 28 U.S.C. §515(a).[1]

We, of course, recognize that in the federal system, no action in Quo Warranto or its equivalent exists by which challenge may be made to title or legality of

---

1. In *United States v. Williams*, (W.D. Mo., Filed November 21, 1974), (also found at 16 Crim. L. Rep. 2223) a motion to dismiss the indictment was granted on the basis that the Special Prosecutor lacked authority. In the Southern District of New York, Judges WERKER and POLLACK came to differing results in *United States v. Crispino*, (S.D.N.Y., Filed February 13, 1975) (16 Crim. L Rep. 2503) and *United States v. Brown*, (S.D.N.Y., Filed February 24, 1975) (16 Crim. L. Rep. 2505) construing 28 U.S.C. §515-(a) as to the scope of the grant of authority to Special Prosecutors, but there was agreement that a motion to dismiss was the proper method by which the issue should be presented.

public office. Therefore, a challenge to a prosecutor's authority or commission would, of necessity, be raised via a motion to dismiss the prosecution. In Pennsylvania procedure, however, we have inherited an express method by which right to, or legality of public office, is challenged. It is Quo Waranto. A motion to quash the indictment on these grounds must be denied as premature until there is a determination in Quo Warranto. Once the illegality of the office is decided, all actions pursuant to the unauthorized conduct of the invalidated title holder then become appropriate subjects of a motion to quash the bills of indictment. I must emphatically disagree that Quo Warranto in this Court is inappropriate where the subject of dispute is criminal in nature.

I consider, in conscience, that there exists here a prime example of what can amount to an abuse of public power. Due process of law, a relatively new term in jurisprudence, embraces a notion which had its origin in the earliest of Judeo-Christian law. It is *fairness,* or as Justice HARLAN wrote, *fundamental fairness.* Justice CARDOZO, in *Snyder v. Massachusetts,* 291 U.S. 97, 116 (1934), expressed it by writing, "[d]ue process of law requires that all proceedings shall be fair, but fairness is relative, not an absolute concept. It is fairness with reference to particular conditions or particular results." Due process, nebulous as it at times seems, perhaps more than any other concept, pervades our legal heritage. Rhetoric is meaningless unless those charged with the administration of justice persistently and judiciously adhere to this concept, and are consistently detached from the influences which seek to exploit our human fraility. It seems incongruous that an office, quasi-judicial in nature, created to insure adherence to the theoretical concept of fairness in the administration of criminal justice, would, in end result by overstepping its mandate, in practice constitute the antithesis of due process. An already overburdened criminal justice process, in run-

ning the route from arrest to incarceration, and allowing far too many abuses, runs the risk of having imposed upon it by our decision today persecutors rather than prosecutors. Although the majority tells us that its decision does not give Mr. Phillips carte blanche, this is precisely what it does when it sustains his summary judgment. The Legislature never intended Section 907 to give such broad investigatory and prosecutorial authority as we now see here. It merely allows *a* local district attorney to be superseded for *a* case or cases.

Precious personal liberties may not be intruded upon and interred under the guise of Section 907. In my judgment, Section 907 had a specific localized purpose. That purpose has been lost.

Justice MUSMANNO expressed it eloquently when he addressed himself in *Smith, supra,* to abuse of power by public officials. Although he was speaking to judicial conduct in the following passage, it is equally applicable to prosecutorial conduct.

"This is all related not as censure, but to emphasize what can occur when the regular forms and procedure of government are not followed, and judges [or prosecutors] embark on independent ventures, sailing in ships without sails of authority, using engines devoid of constitutional power and employing a compass lacking decision direction."

*Smith v. Gallagher, supra,* 408 Pa. at 562, 185 A. 2d at 140. And finally, he wrote in describing another Special Prosecutorial power:

"And in the exercise of this incredible authority Mr. White would not be answerable to anyone for misbehavior or usurpations. Not holding a constitutional office he would not be subject to impeachment; being clothed with judicial sanction he would be immune from criminal prosecution; engaged in governmental business he could not be sued civilly. No person in the United States may constitutionally wear such

impenetrable armor against responsibility for possible illegal performance. The clanking of such armor would be an incongruous sound anywhere, but particularly so in Philadelphia which heard the music of the Liberty Bell proclaiming 'Liberty throughout the land unto all the inhabitants thereof.' One of the reasons why Americans rebelled against the tyrannical King George III was described by Thomas Jefferson: 'He has erected a multitude of New Offices, and sent hither swarms of Officers to harass our People, and eat out their substance.' "

*Smith v. Gallagher, supra,* 408 Pa. at 581, 185 A. 2d at 150. The language seems all too appropriate.

From the Mountain of Sinai through the Field of Runnymede to Colonial Philadelphia, injustice was restrained. I would hope that those principles will be remembered.

I dissent.